LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
ANDREW P. McDEVITT (State Bar #271371)
amcdevitt@walkuplawoffice.com
ATTORNEYS FOR PLAINTIFF JANE DOE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, an individual using a pseudonym,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC; RASIER CA, LLC,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe, by and through undersigned counsel Walkup, Melodia, Kelly & Schoenberger, A Professional Corporation, as her Complaint against Defendant Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, hereby alleges as follows:

## PARTIES

1. Jane Doe is a pseudonym and is not Plaintiff's real name. Submitted with this complaint is an application to the Court for an order permitting Plaintiff to use a pseudonym on the ground that anonymity is necessary to prevent mental harm and to preserve privacy in a matter of a sensitive and highly personal nature.

2. Plaintiff Jane Doe is an adult woman who is a citizen of Mexico.

3. Defendant Uber Technologies, Inc. ("Uber Technologies") is a Delaware Corporation with its principal place of business in the City and County of San Francisco, State of California.

4. Defendants Rasier, LLC and Rasier-CA, LLC (collectively "Rasier") are Delaware Limited Liability Companies with their principal places of business in the City and County of San Francisco, State of California.

5. Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber" the "Company" or "Defendants") operate throughout the United States and internationally in approximately 555 cities, including the City of San Mateo in the County of San Mateo, State of California.

## JURISDICTION AND VENUE

6. The jurisdiction of this action arises under diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of a foreign country. Defendants are all citizens of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7. The Court has personal jurisdiction over Defendants because Defendants are headquartered in San Francisco, California and conduct their business in California.

8. Venue is proper as authorized pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Uber Technologies Inc. is headquartered in, conducts business in, and resides in this district.

## FACTUAL ALLEGATIONS

9. As recently as 2010, the general public considered it unreasonably dangerous for a young woman to get into a strange man's private car with the expectation that he would drive her to a specific location and let her get out of his car, unharmed. That would have been considered hitchhiking. A foreseeable risk of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

2
COMPLAINT FOR DAMAGES

hitchhiking was the potential for sexual assault.

10. If someone needed a ride, one approach that had been considered reasonably safe for decades as of 2010 was to hail a licensed taxi. For decades, local authorities have heavily regulated taxi drivers and taxicabs to provide safeguards and protections for prospective passengers against unscrupulous or predatory drivers.

11. For example, currently in the City and County of San Francisco, an applicant to become a taxi driver must: submit fingerprints that are checked against the California Department of Justice's "RAP Sheet" database; pass a written exam; complete a driver training course; provide a recent photograph; submit to an alcohol and drug test; receive a negative result on the alcohol and drug test; authorize the city to obtain the results of past alcohol and drug tests: notify the city whether he or she has previously failed an alcohol or drug test; be "clean in dress in person"; be free of any condition that might render the applicant unsafe to operate a motor vehicle; have no prior convictions of a crime that would present a risk to public safety; be at least 21; and speak, read, and write the English language. San Francisco Transportation Code § 1103(c). A permitted taxi driver must conspicuously display his or her permit on the outside of his or her clothing at all times while operating a taxi and show that permit to any peace officer upon request. The permit can be worn only by the driver to whom it is issued. Id. at § 1108(a).

12. San Francisco also regulates taxicabs to make sure they clearly stand out, and are easily identified and tracked. Taxicabs must be painted to conform to an approved color scheme and bear a city-issued medallion with an identifying number. Id. at §§ 1102, 1108, 1113(d), 113(6). Every San Francisco taxicab must have the following information displayed on the exterior of the vehicle: the vehicle number; the words "San Francisco Taxicab"; a decal indicating a satisfactory vehicle inspection; the name of the taxi company; and the medallion. Id. These safeguards make every taxicab identifiable and trackable, and thus minimize the chances that a taxi driver

would rob, assault, or take advantage of a passenger, or that someone might masquerade as a taxi driver and victimize a passenger. These safeguards also make it easier for law enforcement officers to apprehend anyone who victimizes a passenger while driving a taxi.

13. Beginning in 2011 with its launch of "Uber X", Uber built a novel "rideshare" industry. To build this industry, Uber had to both (1) change the public's attitude toward getting into a stranger's private car such that there would be demand for its rides, and (2) circumvent the taxi industry's existing safety regulations in order to rapidly recruit a fleet of non-professional drivers to meet this demand. To say that Uber ultimately succeeded would be an understatement. On May 9, 2019, an initial public offering valued Uber at $82.4 billion.

14. To disrupt the public's cautious attitude on the topic of getting into a stranger's private car, Uber spent many millions of dollars marketing and promoting the concept that its non-professional Uber X "rideshare" drivers, driving unregulated, non-distinctive personal cars, can be summoned with the "Uber App" and trusted to transport people safely.

15. To create a large and ready supply of drivers, Uber leapfrogged over safety regulations and laws that govern the transportation industry, and also failed to take and implement reasonable measures to protect rideshare passengers from unscrupulous, unqualified and dangerous drivers. The application process to become an Uber X driver is simple, fast, and designed to allow the Company to hire as many drivers as possible while incurring minimal associated costs. The cost and time savings, however, came at the expense of the safety of Uber X passengers, especially female riders.

16. In contrast to the local regulations that impose background checks, tests, and permit requirements on taxi drivers, Uber instead invited almost anyone with a driver's license to become an Uber X driver. Uber even makes rental car arrangements for those who do not own a car. To become an Uber X driver,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

4
COMPLAINT FOR DAMAGES

individuals apply through Uber's website.

17. Uber generally outsources background checks of driver applicants to third party vendors that do not perform stringent background checks. Those vendors simply run potential drivers' social security numbers through databases similar to those held by private credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions. The background checks conducted by private companies for Uber do not require fingerprinting for comparison against Department of Justice and Federal Bureau of Investigation databases. Neither Uber nor its third party vendors verify that the information provided by applicants is accurate or complete. Thus, people using false names can apply and pass an Uber background check. The turnaround time for an Uber background check is often under 36 hours.

18. Using traditional lobbying efforts as well as its own social media clout, Uber lobbies state and local governments, including in California, to adopt its own proposed "model" regulations, which allow it to conduct its own lax background checks, instead of more stringent regulations like those used for taxi drivers. In Austin, Texas, where regulators imposed fingerprint background checks, Uber punished the regulators by pulling out of the city altogether.

19. As a direct result of Uber's lobbying efforts and social media campaigns, the Company largely self-enforces hiring standards for its Uber X drivers.

20. Uber is and has been aware that its security screening processes are insufficient to prevent unsafe applicants from successfully registering as Uber X drivers. Its inadequate background checks have been the subject of a number of municipal lawsuits and fines.

21. In 2015 the District Attorneys of San Francisco and Los Angeles filed a complaint alleging that individuals who passed Uber's security screening process and were found driving for Uber had the following felony convictions: second degree murder; lewd and lascivious acts against a child under the age of 14; sexual

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

5
COMPLAINT FOR DAMAGES

exploitation of children; kidnapping for ransom with a firearm; assault with a firearm; grand theft; robber; identity theft; burglary; and taking a vehicle without consent. In connection with the litigation, the San Francisco District Attorney called background checks without fingerprinting "completely worthless."

22. Where cities and states (such as Houston and Maryland) perform their own fingerprint-based background checks, numerous driver applicants approved by Uber are ultimately rejected. In Maryland, nearly 15 percent of new rideshare drivers are disqualified for failing the state's background checks. In 2017, when Massachusetts began running its own background checks on Uber and Lyft rideshare drivers, the state rejected 20,000 out of 170,000 rideshare driver applications that had been approved by the companies. Of those, 3,471 were rejected due to violent crimes.

23. In addition to anemic driver background check standards, Uber also operates with almost no standards to ensure that Uber X vehicles stand out and are easily tracked. In contrast to the local regulations that impose color-scheme and medallion requirements making each taxicab distinct and easily traced, Uber devised a system whereby Uber vehicles are distinguished from other vehicles only by an Uber decal that the Uber X driver places in the car's window.

24. To create a large and ready fleet of Uber X vehicles, Uber made its Uber decals easy to obtain so that it could quickly recruit a large numbers of new Uber X drivers, who would drive their own non-distinctive vehicles.

25. Uber intends the Uber decal to reassure the prospective passenger: "This is not just a random stranger's car. It is an Uber X and it is safe to get in."

26. Uber owns several trademark registrations for "UBER" and several Uber-based marks. It has used Uber as a trademark and trade name in connection with goods and services since 2010. In opposing applications submitted by others to the United States Patent and Trademark Office that contain some form of the word "uber", Uber has stated that through its "marketing, promotion, advertising, and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

6
COMPLAINT FOR DAMAGES

commercial activity, the public readily associates the UBER Marks and Names with Uber and its goods and services. The UBER Marks and Names are thus valuable assets of Uber and symbols of its goodwill."[1]

27. Uber knows and intends for its trademark UBER to signify a connection to the company. In opposing applications submitted by others to the USPTO that contain some form of the word "uber", Uber has argued that allowing a person or company, which is not associated with Uber, to use the word "uber" in a trademark name is "likely to falsely suggest a connection between [the unaffiliated person or company] and Uber's trade name and identity because [a trademark containing the word "uber"] is confusingly similar to and would be recognized as an approximation of the same. Even more, the fame and reputation of Uber is of such a nature that a connection with Uber would be presumed when [the unaffiliated person or company] uses [a trademark containing the word uber] in connection with its services."[2] Uber has further argued that "[a trademark containing the word "uber"] uniquely and unmistakably points to Uber's famous name and identity."[3]

28. Trademarks and service marks are recognized to function both as an indication of origin or ownership and to serve as a guarantee of constancy of the quality or other characteristics of a product or service.

29. Uber knows that if a vehicle displays an Uber decal, then members of the public who see the decal will associate the vehicle and its driver with Uber – the trademark owner. Uber has marketed aggressively to condition members of the

---

[1] Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 88/149861 at ¶ 13; *see also* Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at ¶ 13 & Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87/490138 at ¶ 14.

[2] Notice of Opposition filed by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 88/149861 at ¶ 15; *see also* Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at ¶ 15 & Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87/490138 at ¶ 16.

[3] *Id.*

public to think a vehicle and its driver are "safe" if an Uber decal is displayed. Uber presents Uber X to customers as "a ride you can trust."

30. Uber has stated on its website that:

> Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest standards possible, and then working hard to improve them every day. The specifics vary depending what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we are doing in the US is an example of our standards around the world.

31. Uber has stated on its website that:

> From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.

32. Uber has actively fostered and successfully cultivated an image among its customers of safety and superiority to public transportation and traditional taxis, which is reflected in the very name of the Company itself.[4]

33. Until as recently as October 2014, Uber represented that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three step criminal background screening for the U.S. – with country, federal and multi-state checks that go back as far as the law allows –and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

34. Until at least June 2, 2015, Uber's website stated: "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day." Uber's blog also trumpeted: "We'll continue innovating, refining, and working diligently to ensure we're doing

---

[4] Dictionary.com defines "uber" as "designating a person or thing that exceeds the norms or limits of its kind or class."

everything we can to make Uber the safest experience on the road."

35. Uber particularly markets itself as a safer transportation alternative for women. Uber's website and marketing contains numerous pictures of smiling women inside, entering or exiting vehicles, who are meant to appear "safe." Four true and correct examples of Uber's marketing copy are reprinted below:


36. In sum, Uber intends the public to believe that a vehicle bearing an Uber decal is a "ride you can trust," and that its driver has passed the "strictest standards possible" in terms of background checks. However, ordinary members of the public do not know that Uber drivers undergo watered-down background checks. Nor do they know that Uber dispenses Uber decals, adorned with its immediately recognizable name and/or trademarked symbol, liberally and with little or no control.

37. Uber even makes available a "temporary decal" for new drivers to print at home. This decal is publicly available at the website https://image.et.uber.com/lib/fe9112737763017e71/m/1/Uber-decal_print-at-home.png as of June 10, 2019, and is accessed via a public link stating "Need a temporary decal? Print one at home here." There is no security whatsoever to prevent anyone from printing this decal and displaying it on a vehicle.

38. In the San Francisco Bay Area alone, tens of thousands of cars bear Uber decals. No one, not even Uber, knows how many vehicles display an Uber decal, let alone which specific vehicles bear such a decal.

39. Uber has known for years that criminals and sexual predators take advantage of its weak driver screening process and uncontrolled Uber decal system. Soon after launching Uber X, Uber began receiving reports of victims who were assaulted, raped, robbed, or otherwise victimized after they willingly got into a car because it displayed an Uber decal, including instances in which the assailant-driver had not been hailed via the Uber App to pick up the victim-passenger. An April 4, 2019 New York Times investigative article titled *They Thought It Was Their Uber: But the Driver Was a Predator* described "at least two dozen such attacks in the past few years."

40. In sum, robberies, assaults and rape are a foreseeable risk of Uber's lax driver screening process and Uber's uncontrolled distribution of Uber decals. Despite these known deficiencies, Uber holds its brand and logo out to the public as representing safety.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

11
COMPLAINT FOR DAMAGES

41. Uber is a recognized technology innovator, but it nevertheless has failed to take technically feasible and reasonable measures to diminish and guard against the foreseeable harm to passengers caused by its uncontrolled distribution of Uber decals, because such safety measures would not only have added operating costs, but would have also hindered Uber's goal of recruiting as many Uber X drivers, driving their personal, non-distinctive vehicles, as possible in advance of Uber's IPO. Indeed, Uber has actively lobbied and instigated social media campaigns against laws that would regulate rideshare signage to protect against this very type of harm.

42. There are some features built into the Uber App that, when used, can make the rides safer. When a person summons an Uber X vehicle using that person's own Uber App, there are in-app features that allow the passenger to monitor the driver's location as the driver approaches the point of pickup. Under such circumstances, the passenger can also view, in the App, the make, model, and color of vehicle, as well as the license plate number and the driver's photo. Once the trip begins, there is a "panic button" in the App, as well as an option to "share trip status," and features that allow the passenger (or police, if necessary) to monitor the driver's location. However, Uber knows that its customers sometime summon Uber X cars for other people, and that under these circumstances the passenger does not typically have access to the App's features.

43. Uber tracks the location of those who use its App, and Uber has the technological capability to block ride requests that attempt to summon a driver to pick up a passenger at a location remote from that of the person using the App.

44. Uber not only permits its customers to summon rides for others, but it encourages them to do so and assures them that this is a safe and responsible practice. For example, Uber's website says, "Save the day. Grandma doesn't have a smartphone? Mom needs a ride from the airport? Your friend got a little too happy at happy hour? Send them a reliable ride to their destination. It's always appreciated." https://www.uber.com/ride/how-uber-works/request-for-a-guest/

45. Uber has at all relevant times failed to communicate to its customers how lax its driver background check system is, how easy it is to acquire an Uber decal, and how easy it is to impersonate an Uber X driver. In withholding this information from its customers, Uber knowingly caused its customers to rely on the Uber decals as signaling that a driver has been vetted and is trustworthy. In withholding this information, Uber has also created the impression that the Uber App's features that identify the driver and vehicle are there for convenience (to help riders find the correct driver) as opposed to safety (to help riders find a safe driver).

46. On August 14, 2018, Plaintiff Jane Doe, a young woman, voluntarily got into the back seat of a strange man's car. That man (the "Assailant") activated the child-proof locks on the car's rear doors, trapping her inside. He drove to a remote location, where he raped and partially strangled Jane Doe. The Assailant then started driving to another location, where he planned to assault Jane Doe again and probably kill her, but she escaped and was rescued by a passing motorist.

47. The Assailant fled, but was identified and captured weeks later, only because the San Mateo Police Department conducted an exhaustive and superb investigation. As of the time of this complaint, the Assailant sits in jail and faces criminal charges that could lead to imprisonment for life.

48. Jane Doe is not from the United States. She and her fiancé are from Mexico. Her fiancé had business in the Bay Area in the middle of August 2018. She flew to the region to spend a few days with him for a mini-vacation. It was in the middle of this trip, August 14, 2018, that the assault occurred.

49. In the early evening of August 14, 2018, Jane Doe was at a shopping mall in San Mateo County, California. She wanted to return to the nearby hotel at which she and her fiancé were staying. Her own smartphone was running low on power. She therefore texted her fiancé, who was elsewhere, and asked that he use his Uber App to summon an Uber X ride for her. Her fiancé complied with her request. As described above, using the Uber App to summon a ride for someone else is a

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

13
COMPLAINT FOR DAMAGES

practice that Uber allows and encourages.

50. There was an Uber decal on the windshield of a car that showed up at the location at which Jane Doe expected to be picked up. Jane Doe, whose primary language is not English, got into that car only because it had an Uber decal in the window and she believed, perhaps mistakenly, that the driver said her boyfriend's name when she neared the car.

51. In sum, Jane Doe willingly got into the back of this strange man's car because she believed that it was her Uber X rideshare and that it was safe to do so. As alleged above, Uber purposefully disrupted and changed the public's attitudes about riding in a stranger's private car, and it aggressively marketed the concept that it is safe for a young woman to get into an Uber X car under the circumstances presented to Jane Doe on the evening of August 14, 2018.

52. Months before Jane Doe was assaulted, Uber learned that the Assailant was a menace to women. He was, at that time, an Uber X driver, authorized by Uber to use the Uber App. On or about June 8, 2018, a woman reported to the Company that the Assailant behaved disturbingly while giving her an Uber X ride. Uber "investigated" her complaint by interviewing the Assailant over the telephone. He admitted to Uber that he drove the passenger off her "route", flirted with her, and drove her to a "horse stable," ostensibly so they could "talk."

53. Uber did suspend the Assailant's access to the Uber App after interviewing that woman and the Assailant, but the Company did nothing more than suspend access. It did not attempt to take back the Uber decal on his car or warn others about him. Upon the Assailant's arrest months later for his terrifying attack on Jane Doe, police observed an Uber decal on his car and found numerous Uber decals in the Assailant's possession.

54. Indeed, Uber was unable to put the genie it had created back in the bottle. Uber had disseminated tens of thousands of Uber decals in the Bay Area alone with no way of tracking them, let alone retrieving them from men like the Assailant

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

in this case, whom Uber knew, or had reason to suspect, were dangerous sexual predators.

55. Upon learning of another woman's complaint against its driver, Uber did nothing to notify its main competitor, Lyft, of the Assailant's concerning behavior even though Uber was aware that many of its drivers concurrently drive for Lyft. As a result, the Assailant was continuing to offer rides through Lyft up until and even after he assaulted Plaintiff Jane Doe.

56. It turns out that the Assailant had a significant criminal history that predated his driving for Uber, including convictions/arrests for driving under the influence of alcohol, driving on a suspended license, being under the influence of a controlled substance, possession of a controlled substance, vehicle theft, vandalism, assault/battery, and domestic violence. Nevertheless, Uber: "passed" him after a purported background check; provided him with Uber decals; gave him access to the Uber App; and permitted him to pick up Uber X passengers.

57. Jane Doe is just one victim of Uber's lax rideshare system that so easily allows a predator to become an Uber X driver, or to masquerade as an Uber X driver even if he no longer has access to or is not using the Uber App.

58. The attack on Jane Doe and other similar assaults by men who appeared to be rideshare drivers received significant public attention just before Uber's planned IPO. Rather than changing its ineffectual driver-vetting process and uncontrolled Uber decal scheme to more time-consuming and costly but safer systems, Uber instead responded to the negative publicity by blaming the victim-passenger. Uber also tried to shift the burden to the passenger to check and vet the Uber X driver who picks her up. On or about April 18, 2019, Uber rolled out new "safety features" (nothing more than text message prompts to passengers who are waiting for their Uber X to arrive). At that same time Tony West, Uber's chief legal and security officer, said, "It's become sort of second nature whenever we get into a car to buckle up. It has to be second nature before you get into a car to ask,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15
COMPLAINT FOR DAMAGES

'Hey, who are you here to pick up?'" https://www.nbcnews.com/news/us-news/uber-unveils-new-safety-measures-wake-college-student-s-murder-n995611 For Plaintiff Jane Doe and many other past victims, this "fatherly advice" is too late. For the future passenger-victims, this will be too little. Other Uber X passengers will get into cars bearing Uber decals without cross-examining the driver for a variety of foreseeable reasons, *e.g.*, hearing impairment, language barrier, intoxication, youthful carelessness, residual trust in the brand Uber cultivated, or because they heard the driver do or say something that they mistakenly interpret as indicating he is the correct driver. Under Uber's current and flawed systems, the type of harm that befell Plaintiff Jane Doe will happen over and over again.

59. Uber purposefully made an end run around transportation safety laws and regulations when it launched Uber X, such as those that regulate the taxi industry. Uber failed to respond when the safety flaws in its Uber X rideshare system, described above, came to the Company's attention. The Company could have implemented reasonable and feasible remedial measures to prevent and guard against such incidents. Uber instead chose profit (getting as many Uber drivers and riders on the road as soon as possible in advance of its IPO) over safety (implementing reasonable safeguards that would have added time and increased costs). Such conduct is despicable and demonstrates a conscious disregard of the safety and lives of prospective Uber X passengers like Plaintiff Jane Doe.

### FIRST CAUSE OF ACTION
### (ASSAULT, BATTERY, AND FALSE IMPRISONMENT BY OSTENSIBLE AGENT)

60. Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

61. Uber intentionally or carelessly created the impression that the man who assaulted, battered and falsely imprisoned Jane Doe was Uber's employee or

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

16
COMPLAINT FOR DAMAGES

agent.

62. Jane Doe reasonably believed that the Assailant who assaulted and battered and falsely imprisoned her was Uber's employee or agent.

63. Jane Doe was harmed because she reasonably relied on her belief.

64. As a direct and proximate result of the aforementioned conduct, Jane Doe has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

65. As a direct and proximate result of the aforementioned conduct, Jane Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

66. Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## (NEGLIGENCE)

67. Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

68. Uber was at all relevant times in the business of transporting the general public for profit, and held itself out to the public generally and indifferently for that purpose.

69. Uber at all relevant times advertised its services to the general public.

70. Uber at all relevant times charged standardized fees for its services, which were not separately negotiated with each passenger.

71. In requesting that her fiancé summon an Uber ride for her, Jane Doe intended to become an Uber passenger.

72. In encouraging customers to summon rides for others, and in accepting the ride request from Jane Doe's fiancé for a location Uber knew was remote from his location and thus must be for a person other than himself, Uber accepted Jane Doe as a passenger.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

17
COMPLAINT FOR DAMAGES

73. In relying on Uber to send a driver to her location, and to provide trade dress visually identifying its driver, Jane Doe placed herself under Uber's control.

74. Jane Doe went to the location designated as the site of departure at the appropriate time.

75. California Civil Code § 2100 thus obligated Uber to "use the utmost care and diligence for" Jane Doe's safe carriage, to "provide everything necessary for that purpose," and to "exercise to that end a reasonable degree of skill," including with respect to providing a safe place and manner for Jane Doe to locate her driver, as well as providing a safe ride until she disembarked in a safe location.

76. Uber negligently, and with gross negligence and recklessness, breached the duty of care that it owed to Jane Doe.

77. As a direct and proximate result of the aforementioned conduct and breach of duty, Jane Does has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

78. As a direct and proximate result of the aforementioned conduct and breach of duty, Jane Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

79. Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

## PRAYER FOR RELIEF

A. For noneconomic damages according to proof at trial;

B For economic damages according to proof at trial;

C. For costs of suit and attorneys' fees to the fullest extent permitted by law;

D. For pre-judgment and post-judgment interest according to law;

E. For punitive and exemplary damages in an amount that is sufficient to punish Uber and deter it and others from engaging in similar conduct in the future;

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

18
COMPLAINT FOR DAMAGES

1     F.     For such other and further relief as the Court may deem proper.

2 Dated: June 11, 2019     WALKUP, MELODIA, KELLY & SCHOENBERGER

By: _____
MATTHEW D. DAVIS
SARA M. PETERS
ANDREW P. McDEVITT
Attorneys for Plaintiff Jane Doe

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

19
COMPLAINT FOR DAMAGES

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: June 11, 2018

WALKUP, MELODIA, KELLY & SCHOENBERGER

By: _____
MATTHEW D. DAVIS
SARA M. PETERS
ANDREW P. McDEVITT
Attorneys for Plaintiff Jane Doe

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

20
COMPLAINT FOR DAMAGES