LAW OFFICES OF

**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
ANDREW P. McDEVITT (State Bar #271371)
amcdevitt@walkuplawoffice.com
**ATTORNEYS FOR PLAINTIFF JANE DOE**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, an individual using a pseudonym, | Case No. 19-cv-03310-JSC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| UBER TECHNOLOGIES, INC., RASIER, LLC; RASIER CA, LLC, | |
| Defendant. | |

Plaintiff Jane Doe, by and through undersigned counsel Walkup, Melodia, Kelly & Schoenberger, A Professional Corporation, as her Complaint against Defendant Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, hereby alleges as follows:

**PARTIES**

1.    Jane Doe is a pseudonym and is not Plaintiff's real name. With her original complaint, Jane Doe submitted an application to the Court for an order permitting her to use a pseudonym on the ground that anonymity is necessary to prevent mental harm and to preserve privacy in a matter of a sensitive and highly personal nature.

2.    Plaintiff Jane Doe is an adult woman who is a citizen of Mexico.

3.    Defendant Uber Technologies, Inc. ("Uber Technologies") is a Delaware Corporation with its principal place of business in the City and County of San Francisco, State of California.

4.    Defendants Rasier, LLC and Rasier-CA, LLC (collectively "Rasier") are Delaware Limited Liability Companies with their principal places of business in the City and County of San Francisco, State of California.

5.    Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber" the "Company" or "Defendants") operate throughout the United States and internationally in approximately 555 cities, including the City of San Mateo in the County of San Mateo, State of California.

## JURISDICTION AND VENUE

6.    The jurisdiction of this action arises under diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of a foreign country. Defendants are all citizens of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    The Court has personal jurisdiction over Defendants because Defendants are headquartered in San Francisco, California and conduct their business in California.

8.    Venue is proper as authorized pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Uber Technologies Inc. is headquartered in, conducts business in, and resides in this district.

## FACTUAL ALLEGATIONS

9.    As recently as 2010, the general public considered it unreasonably dangerous for a young woman to get into a strange man's private car with the expectation that he would drive her to a specific location and let her get out of his car, unharmed. That would have been considered hitchhiking. A foreseeable risk of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

2

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  hitchhiking was the potential for sexual assault.

2      10.    If someone needed a ride, one approach that had been considered

3  reasonably safe for many decades as of 2010 was to hail a licensed taxi. For decades,

4  local authorities have heavily regulated taxi drivers and taxicabs to provide

5  safeguards and protections for prospective passengers against unscrupulous or

6  predatory drivers.

7      11.    For example, currently in the City and County of San Francisco, an

8  applicant to become a taxi driver must: submit fingerprints that are checked against

9  the California DOJ "RAP Sheet" database; pass a written exam; complete a driver

10  training course; provide a recent photograph; submit to an alcohol and drug test;

11  receive a negative result on the alcohol and drug test; authorize the city to obtain the

12  results of past alcohol and drug tests: notify the city whether he or she has previously

13  failed an alcohol or drug test; be "clean in dress in person"; be free of any condition

14  that might render the applicant unsafe to operate a motor vehicle; have no prior

15  convictions of a crime that would present a risk to public safety; be at least 21; and

16  speak, read, and write the English language. San Francisco Transportation Code §

17  1103(c). A permitted taxi driver must conspicuously display his or her permit on the

18  outside of his or her clothing at all times while operating a taxi and show that permit

19  to any peace officer upon request. The permit can be worn only by the driver to whom

20  it is issued. Id. at § 1108(a).

21      12.    San Francisco also regulates taxicabs to make sure they clearly stand

22  out, and are easily identified and tracked. Taxicabs must be painted to conform to an

23  approved color scheme and bear a city-issued medallion with an identifying number.

24  Id. at §§ 1102, 1108, 1113(d), 113(6). Every San Francisco taxicab must have the

25  following information displayed on the exterior of the vehicle: the vehicle number; the

26  words "San Francisco Taxicab"; a decal indicating a satisfactory vehicle inspection;

27  the name of the taxi company; and the medallion. Id. These safeguards make every

28  taxicab identifiable and trackable, and thus minimize the chances that a taxi driver

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

3

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   would rob, assault, or take advantage of a passenger, or that someone might

2   masquerade as a taxi driver and victimize a passenger. These safeguards also make

3   it easier for law enforcement officers to apprehend anyone who victimizes a

4   passenger while driving a taxi.

5       13.    Beginning in 2011 with its launch of "Uber X," Uber built a novel

6   "rideshare" industry. In order to build this industry, Uber had to both (1) change the

7   public's attitude toward getting into a stranger's private car such that there would be

8   demand for its rides, and (2) circumvent the taxi industry's existing safety

9   regulations in order to rapidly recruit a fleet of non-professional drivers to meet this

10  demand. To say that Uber ultimately succeeded would be an understatement. On

11  May 9, 2019, an initial public offering valued Uber at $82.4 billion.

12      14.    In order to disrupt the public's cautious attitude on the topic of getting

13  into a stranger's private car, Uber spent many millions of dollars marketing and

14  promoting the concept that its non-professional Uber X "rideshare" drivers, driving

15  unregulated, non-distinctive personal cars, can be summoned with the "Uber App"

16  and trusted to transport people safely.

17      15.    In order to create a large and ready supply of drivers, Uber leapfrogged

18  over safety regulations and laws that govern the transportation industry, and also

19  failed to take and implement reasonable measures to protect rideshare passengers

20  from unscrupulous, unqualified and dangerous drivers. The application process to

21  become an Uber X driver is simple, fast, and designed to allow the Company to hire

22  as many drivers as possible while incurring minimal associated costs. The cost and

23  time savings, however, come at the expense of the safety of Uber X passengers,

24  especially female riders.

25      16.    In contrast to the local regulations that impose background checks,

26  tests, and permit requirements on taxi drivers, Uber instead invited almost anyone

27  with a driver's license to become an Uber X driver. Uber even makes rental car

28  arrangements for those who do not own a car. To become an Uber X driver,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

individuals apply through Uber's website.

17.     Uber generally outsources background checks of driver applicants to third party vendors that do not perform stringent background checks. Those vendors simply run potential drivers' social security numbers through databases similar to those held by private credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions. The background checks conducted by private companies for Uber do not require fingerprinting for comparison against Department of Justice and Federal Bureau of Investigation databases. Neither Uber nor its third party vendors verify that the information provided by applicants is accurate or complete. The turnaround time for an Uber background check is often under 36 hours.

18.     Using traditional lobbying efforts as well as its own social media clout, Uber lobbies state and local governments, including in California, to adopt its own proposed "model" regulations, which allow it to conduct its own background checks, instead of more stringent regulations like those used for taxi drivers. In Austin, Texas, where regulators imposed fingerprint background checks, Uber punished the regulators by pulling out of the city altogether.

19.     As a direct result of Uber's lobbying efforts and social media campaigns, the Company largely self-enforces hiring standards for its Uber X drivers.

20.     Uber is and has been aware that its security screening processes are insufficient to prevent unsafe applicants from successfully registering as Uber X drivers. Its inadequate background checks have been the subject of a number of municipal lawsuits and fines.

21.     In 2015 the District Attorneys of San Francisco and Los Angeles filed a complaint alleging that individuals who passed Uber's security screening process and were found driving for Uber had the following felony convictions: second degree murder; lewd and lascivious acts against a child under the age of 14; sexual exploitation of children; kidnapping for ransom with a firearm; assault with a

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1  firearm; grand theft; robber; identity theft; burglary; and taking a vehicle without

2  consent. In connection with the litigation, the San Francisco District Attorney called

3  background checks without fingerprinting "completely worthless."

4        22.    Where cities and states (such as Houston and Maryland) perform their

5  own fingerprint-based background checks, numerous driver applicants approved by

6  Uber are ultimately rejected. In Maryland, nearly 15 percent of new rideshare

7  drivers are disqualified for failing the state's background checks. In 2017, when

8  Massachusetts began running its own background checks on Uber and Lyft rideshare

9  drivers, the state rejected 20,000 out of 170,000 rideshare driver applications that

10  had been approved by the companies. Of those, 3,471 were rejected due to violent

11  crimes.

12        23.    In addition to relaxed driver background check standards, Uber also

13  operates with almost no standards to ensure that Uber X vehicles stand out and are

14  easily tracked. In contrast to the local regulations that impose color-scheme and

15  medallion requirements making each taxicab distinct and easily traced, Uber devised

16  a system whereby Uber vehicles are distinguished from other vehicles only by an

17  Uber decal that the Uber X driver places in the car's window. Uber made its Uber

18  decals easy to obtain so that it could quickly recruit a large numbers of new Uber X

19  drivers, who would drive their own non-distinctive vehicles.

20        24.    Uber intends the Uber decal to reassure the prospective passenger:

21  "This is not just a random stranger's car. It is an Uber X and it is safe to get in."

22        25.    Uber owns several trademark registrations for "UBER" and several

23  Uber-based marks. It has used Uber as a trademark and trade name in connection

24  with goods and services since 2010. In opposing applications submitted by others to

25  the United States Patent and Trademark Office that contain some form of the word

26  "uber", Uber has stated that through its "marketing, promotion, advertising, and

27  commercial activity, the public readily associates the UBER Marks and Names with

28  Uber and its goods and services. The UBER Marks and Names are thus valuable

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   assets of Uber and symbols of its goodwill."[1]

2      26.   Uber knows that the general public understands the use of its UBER

3   decal on a vehicle to mean that the driver is working for Uber, and that Uber has

4   vetted the driver and is certifying that the driver is a safe driver who will provide a

5   safe ride. Further, Uber intends for the use of its UBER decal on a vehicle to signify

6   these things (that the driver is working for Uber, and that Uber certifies the driver

7   as a safe driver). Uber advertises and markets its trademark, decal, and safety record

8   in a manner designed to cause the public to believe these things.

9      27.   In opposing applications submitted by others to the United States

10  Patent and Trademark Office that contain some form of the word "uber", Uber has

11  argued that allowing a person or company, which is not associated with Uber, to use

12  the word "uber" in a trademark name is "likely to falsely suggest a connection

13  between [the unaffiliated person or company] and Uber's trade name and identity

14  because [a trademark containing the word "uber"] is confusingly similar to and would

15  be recognized as an approximation of the same. Even more, the fame and reputation

16  of Uber is of such a nature that a connection with Uber would be presumed when [the

17  unaffiliated person or company] uses [a trademark containing the word uber] in

18  connection with its services."[2] Uber has further argued that "[a trademark containing

19  the word "uber"] uniquely and unmistakably points to Uber's famous name and

20  identity."[3]

21      28.   Trademarks and service marks are recognized to function both as an

22  _____

23  [1] Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of
    Trademark App. Ser. No. 88/149861 at ¶ 13; *see also* Notice of Opposition submitted

24  by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at
    ¶ 13 & Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of

25  Trademark App. Ser. No. 87/490138 at ¶ 14.

26  [2] Notice of Opposition filed by Uber Technologies, Inc. in In the matter of Trademark
    App. Ser. No. 88/149861 at ¶ 15; *see also* Notice of Opposition submitted by Uber

27  Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at ¶ 15 &
    Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of

28  Trademark App. Ser. No. 87/490138 at ¶ 16.

    [3] *Id.*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

7

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  indication of origin or ownership and to serve as a guarantee of constancy of the

2  quality or other characteristics of a product or service.

3       29.    Uber presents vehicles bearing the UBER decal to customers as "a ride

4  you can trust."

5       30.    Uber has stated on its website that:

6          Wherever you are around the world, Uber is
7          committed to connecting you to the safest ride on the
        road. That means setting the strictest standards
8          possible, and then working hard to improve them
        every day. The specifics vary depending what local
9          governments allow, but within each city we operate,
        we aim to go above and beyond local requirements to
10          ensure your comfort and security – what we are
        doing in the US is an example of our standards
11          around the world.

12       31.    Uber has stated on its website that:

13          From the moment you request a ride to the moment
14          you arrive, the Uber experience has been designed
        from the ground up with your safety in mind.

15       32.    Uber has actively fostered and successfully cultivated an image among

16  its customers of safety and superiority to public transportation and traditional taxis

17  – which is reflected in the very name of the Company itself.[4]

18       33.    Until as recently as October 2014, Uber represented that "Every

19  ridesharing and livery driver is thoroughly screened through a rigorous

20  process we've developed using industry-leading standards. This includes a

21  three step criminal background screening for the U.S. – with country, federal

22  and multi-state checks that go back as far as the law allows –and ongoing

23  reviews of drivers' motor vehicle records throughout their time on Uber."

24       34.    Until at least June 2, 2015, Uber's website stated: "Wherever you

25  are around the world, Uber is committed to connecting you to the safest ride on

26

27

28  [4] Dictionary.com defines "uber" as "designating a person or thing that exceeds the
norms or limits of its kind or class."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  the road. That means setting the strictest safety standards possible, then

2  working hard to improve them every day." Uber's blog also trumpeted: "We'll

3  continue innovating, refining, and working diligently to ensure we're doing

4  everything we can to make Uber the safest experience on the road."

5      35.    Uber particularly markets itself as a safer transportation alternative for

6  women. Uber's website and marketing contains numerous pictures of smiling women

7  entering and exiting vehicles, who are meant to appear "safe." Five true and correct

8  examples of Uber's marketing copy are reprinted below:



22  / / / /

23  / / / /

24  / / / /

25  / / / /

26  / / / /

27  / / / /

28  / / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24   / / / /
25   / / / /
26   / / / /
27   / / / /
28   / / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC



36.     Uber intends the public to believe that a vehicle bearing an Uber decal is a "ride you can trust," and that its driver has passed the "strictest standards possible" in terms of background checks.

37.     Uber uses its decal as the way it confers its reputation and its safety certification upon a particular driver and ride.

38.     Uber's advertising and marketing representations have been successful, and at all relevant times members of the public, including Plaintiff Jane Doe, relied on the Uber decal on a vehicle as signifying that the driver is working for Uber, the trademark owner, and that the driver has been vetted and certified as safe by Uber.

39.     At all relevant times, Uber dispensed Uber decals, adorned with its immediately recognizable name and/or trademarked symbol, liberally and with little or no control.

40.     Uber even makes available a "temporary decal" for new drivers to print at home. This decal is publicly available at the website https://image.et.uber.com/lib/fe9112737763017e71/m/1/Uber-decal_print-at-home.png as of June 10, 2019, and is accessed via a public link stating "Need a temporary decal? Print one at home here." There is no security whatsoever to prevent anyone

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    from printing this decal and displaying it in any vehicle.

2       41.    At all relevant times, Uber did not even attempt to retrieve its Uber

3    decals from former Uber drivers who proved to be unsafe.

4       42.    In the San Francisco Bay Area alone, tens of thousands of cars bear

5    Uber decals. No one, not even Uber, knows how many vehicles display an Uber decal,

6    let alone which specific vehicles bear such a decal.

7       43.    At all relevant times, members of the public, including Plaintiff Jane

8    Doe, did not know that Uber exercises little control over its Uber decals, nor that the

9    presence of an Uber decal on a vehicle is essentially meaningless.

10       44.    Uber knew or should have known that the public was unaware of its lax

11    control over its decals. Nevertheless, at all relevant times, Uber took no steps to

12    inform the public of its lax control, or of the fact that the decal was unreliable as an

13    indicator of employment status or safety.

14       45.    Uber has known for years that criminals and sexual predators take

15    advantage of its weak driver screening process and uncontrolled Uber decal system.

16    Soon after launching Uber X, Uber began receiving reports of victims who were

17    assaulted, raped, robbed, or otherwise victimized after they willingly got into a car

18    because it displayed an Uber decal, including instances in which the assailant-driver

19    had not been hailed via the Uber App to pick up the victim-passenger.  On December

20    5, 2019, Uber released a report confirming that it received reports of the following

21    occurrences during Uber rides in the year 2018 alone: 235 rapes, 280 attempted

22    rapes, 1,560 groping incidents, 376 instances of unwanted kissing the breast,

23    buttocks, or mouth, and 594 reports of unwanted kissing to another body party. It

24    reported receiving a total of 5,981 reports of sexual assault between 201 and 2018.

25       46.    In sum, assaults and rape are a foreseeable risk of Uber's lax driver

26    screening process and Uber's uncontrolled distribution of Uber decals. Despite these

27    known deficiencies, Uber holds its brand and logo out to the public as representing

28    safety.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

47.     Uber is a recognized technology innovator, but it nevertheless has failed to take technically feasible and reasonable measures to diminish and guard against this foreseeable harm to passengers caused by its uncontrolled distribution of Uber decals, because such safety measures would not only have added operating costs, but would have also hindered Uber's goal of recruiting as many Uber X drivers, driving their personal, non-distinctive vehicles, as possible in advance of Uber's IPO. Indeed, Uber has actively lobbied and instigated social media campaigns against laws that would regulate rideshare signage to protect against this very type of harm.

48.     There are some features built into the Uber App that, when used, can make the rides safer. When a person is riding in an Uber X vehicle summoned using that person's own Uber App, there are in-app features that allow the passenger to monitor the driver's location as the driver approaches the point of pickup. Under such circumstances, the passenger can also view, in the App, the make, model, and color of vehicle, as well as the license plate number and the driver's photo. Once the trip begins, there is a "panic button" in the app, as well as an option to "share trip status," and features that allow the passenger (or police, if necessary) to monitor the driver's location.

49.     Uber is and at all relevant times has been aware that its customers sometime summon Uber X cars for other people, and that under these circumstances the passenger does not typically have access to the App's features.

50.     Uber tracks the location of those who use its App, and Uber has the technological capability to block ride requests that attempt to summon a driver to pick up a passenger at a location remote from that of the person using the App.

51.     Uber not only permits its customers to summon rides for others by failing to block such requests, but it encourages them to do so and assures them that this is a safe and responsible practice. For example, Uber's website says, "Save the day. Grandma doesn't have a smartphone? Mom needs a ride from the airport? Your friend got a little too happy at happy hour? Send them a reliable ride to their

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

13

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  destination. It's always appreciated." https://www.uber.com/ride/how-uber-
2  works/request-for-a-guest/

3       52.   By encouraging its customers to summon rides for others, and making
4  this an acceptable way to use its service, Uber further emphasizes and advertises the
5  rider's reliance on the Uber decal as the means to determine that a given ride is a
6  provided by a safe, vetted, reliable Uber driver.

7       53.   Uber intentionally chose to expand its market share to include those
8  riders who do not have a working smart phone available, even though it knew that by
9  doing so it would be depriving those riders of the few safety mechanisms it otherwise
10 provides, and would cause those riders to rely on its unsafe decal system.

11      54.   Prior to Ms. Doe's incident, Uber intentionally chose not to advertise to
12 riders that, in order to protect themselves from dangerous drivers, they should
13 always verify the license plate and driver's appearance, using the App. Uber made
14 this choice in order to increase and retain its market share.

15      55.   Uber has at all relevant times failed to communicate to its customers
16 how lax its driver background check system is, how easy it is to acquire an Uber
17 decal, and how easy it is to impersonate an Uber X driver. In withholding this
18 information from its customers, Uber knowingly caused its customers to rely on the
19 Uber decals as signaling that a driver has been vetted by Uber and is trustworthy. In
20 withholding this information, Uber has also created the impression that the Uber
21 App's features that identify the driver and vehicle are there for convenience (to help
22 riders find the correct driver) as opposed to safety (to help riders find a safe driver).

23      56.   On August 14, 2018, Plaintiff Jane Doe, a young woman, voluntarily got
24 into the back seat of a strange man's car. That man (the "Assailant") activated the
25 childproof locks on the car's rear doors, trapping her inside. He drove to a remote
26 location, where he raped and partially strangled Jane Doe. The Assailant then
27 started driving to another location, where he planned to assault Jane Doe again and
28 probably kill her, but she escaped and was rescued by a passing motorist.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

14

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

57.     The Assailant fled, but was identified and captured weeks later, only because the San Mateo Police Department conducted an exhaustive and superb investigation. As of the time of this complaint, the Assailant sits in jail and faces criminal charges that could lead to imprisonment for life.

58.     Jane Doe is not from the United States. She and her fiancé are from Mexico. Her fiancé had business in the Bay Area in the middle of August 2018. She flew to the region to spend a few days with him for a mini-vacation. It was in the middle of this trip, August 14, 2018, that the assault occurred.

59.     In the early evening of August 14, 2018, Jane Doe was at a shopping mall in San Mateo County, California. She wanted to return to the nearby hotel at which she and her fiancé were staying. Her own smartphone was running low on power. She therefore texted her fiancé, who was elsewhere, and asked that he use his Uber App to summon an Uber X ride for her. Her fiancé complied with her request. As described above, using the Uber App to summon a ride for someone else is a practice that Uber allows and encourages.

60.     There was an Uber decal on the windshield of a car that showed up at the location at which Jane Doe expected to be picked up. Jane Doe, whose primary language is not English, got into that car only because it had an Uber decal in the window and she believed, perhaps mistakenly, that the driver said her boyfriend's name when she neared the car.

61.     After Jane Doe overheard the driver say something and after she got into the back of the car, the driver looked in his rearview mirror and said "wow." On information and belief, before Jane Doe got into his vehicle, the driver did not know that Jane Doe was at the mall, was unaware that she was about to enter his car, and had not yet formed an intent to kidnap, assault, or rape her or anyone else. The driver slowed down outside the mall for unknown reasons. Because he appeared to be working for Uber, Jane Doe got into his car. On information and belief, when he looked in his rearview mirror, he said "wow" because he was pleased that an

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

attractive woman had gotten into his car, alone. On information and belief, this excited the driver and caused him to form a desire and intent to kidnap and then assault Ms. Doe.

62.     In sum, Jane Doe willingly got into the back of this strange man's car because she believed that it was an Uber X rideshare and that it was safe to do so. As alleged above, Uber purposefully disrupted and changed the public's attitudes about riding in a stranger's private car, and it aggressively marketed the concept that it is safe for a young woman to get into an Uber X car under the circumstances presented to Jane Doe on the evening of August 14, 2018.

63.     Months before Jane Doe was assaulted, Uber learned that the Assailant was a menace to women. He was, at that time, an Uber X driver, authorized by Uber to use the Uber App. On or about June 8, 2018, a woman reported to the Company that the Assailant behaved disturbingly while giving her an Uber X ride. Uber "investigated" her complaint by interviewing the Assailant over the telephone. He admitted to Uber that he drove the passenger off her "route", flirted with her, and drove her to a "horse stable," ostensibly so they could "talk."

64.     Uber did suspend the Assailant's access to the Uber App after interviewing that woman and the Assailant, but the Company did nothing more than suspend access. It did not attempt to take back the Uber decal on his car or warn others about him. Upon the Assailant's arrest months later for his terrifying attack on Jane Doe, police observed an Uber decal on his car and found numerous Uber decals in the Assailant's possession.

65.     Indeed, Uber was unable to put the genie it had created back in the bottle. Uber had disseminated tens of thousands of Uber decals in the Bay Area alone with no way of tracking them, let alone retrieving them from men like the Assailant in this case, whom Uber knew, or had reason to suspect, were dangerous sexual predators.

66.     Upon learning of another woman's complaint against its driver, Uber

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

16
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

did nothing to notify its main competitor, Lyft, of the Assailant's concerning behavior even though Uber was aware that many of its drivers concurrently drive for Lyft. As a result, the Assailant was continuing to offer rides through Lyft up until and even after he assaulted Plaintiff Jane Doe.

67.   It turns out that the Assailant had a significant criminal history that predated his driving for Uber, including convictions/arrests for driving under the influence of alcohol, driving on a suspended license, being under the influence of a controlled substance, possession of a controlled substance, vehicle theft, vandalism, assault/battery, and domestic violence. Nevertheless, Uber: "passed" him after a purported background check; provided him with Uber decals; gave him access to the Uber App; and permitted him to pick up Uber X passengers.

68.   Jane Doe is just one victim of Uber's lax rideshare system that so easily allows a predator to become an Uber X driver, or to masquerade as an Uber X driver even if he no longer has access to or is not using the Uber App.

69.   The attack on Jane Doe and other similar assaults by men who appeared to be rideshare drivers received significant public attention just before Uber's planned IPO. Rather than changing its ineffectual driver-vetting process and uncontrolled Uber decal scheme to more time-consuming and costly but safer systems, Uber instead responded to the negative publicity by blaming the victim-passenger. Uber also tried to shift the burden to the passenger to check and vet the Uber X driver who picks her up. On or about April 18, 2019, Uber rolled out new "safety features" (nothing more than text message prompts to passengers who are waiting for their Uber X to arrive). At that same time Tony West, Uber's chief legal and security officer, said, "It's become sort of second nature whenever we get into a car to buckle up. It has to be second nature before you get into a car to ask, 'Hey, who are you here to pick up?'" https://www.nbcnews.com/news/us-news/uber-unveils-new-safety-measures-wake-college-student-s-murder-n995611 For Plaintiff Jane Doe and many other past victims, this "fatherly advice" is too late. For the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

future passenger-victims, this will be too little. Other Uber X passengers will get into cars bearing Uber decals without cross-examining the driver for a variety of foreseeable reasons, *e.g.*, hearing impairment, language barrier, intoxication, youthful carelessness, residual trust in the brand Uber cultivated, or because they heard the driver do or say something that they mistakenly interpret as indicating he is the correct driver. Under Uber's current and flawed systems, the type of harm that befell Plaintiff Jane Doe will happen over and over again.

70.     Uber purposefully made an end run around transportation safety laws and regulations when it launched Uber X, such as those that regulate the taxi industry. Uber failed to respond when the safety flaws in its Uber X rideshare system, described above, came to the Company's attention. The Company could have implemented reasonable and feasible remedial measures to prevent and guard against such incidents. Uber instead chose profit (getting as many Uber drivers and riders on the road as soon as possible in advance of its IPO) over safety (implementing reasonable safeguards that would have added time and increased costs). Such conduct is despicable and demonstrates a conscious disregard of the safety and lives of prospective Uber X passengers like Plaintiff Jane Doe.

## FIRST CAUSE OF ACTION
## (FALSE IMPRISONMENT BY OSTENSIBLE AGENT)

71.     Plaintiff alleges and reasserts all the preceding paragraphs as if fully set forth herein.

72.     Uber intentionally or carelessly created the impression that the man who assaulted, battered and falsely imprisoned Jane Doe was Uber's employee or agent.

73.      Jane Doe reasonably believed that the Assailant was Uber's employee or agent and therefore got into his vehicle.

74.     As a result of Jane Doe getting into his vehicle, on her reliance on his

LAW OFFICES OF
Walkup, Melodia, Kelly
& Schoenberger
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

appearance of agency, Assailant formed the desire and intent to kidnap Jane Doe.

75.   Jane Doe was falsely imprisoned (kidnapped) because she reasonably relied on her belief.

76.   As a direct and proximate result of the aforementioned conduct, Jane Doe has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

77.   As a direct and proximate result of the aforementioned conduct, Jane Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

78.   Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## (ASSAULT AND BATTERY BY OSTENSIBLE AGENT)

79.   Plaintiff alleges and reasserts all the preceding paragraphs as if fully set forth herein.

80.   Uber intentionally or carelessly created the impression that the man who assaulted and battered Jane Doe was Uber's employee or agent.

81.   Jane Doe reasonably believed that the Assailant was Uber's employee or agent and therefore got into his vehicle.

82.   As a result of Jane Doe getting into his vehicle, on her reliance on his appearance of agency, Assailant formed the desire and intent to assault, batter, and rape Jane Doe.

83.   Jane Doe was falsely imprisoned (kidnapped) and raped because she reasonably relied on her belief.

84.   As a direct and proximate result of the aforementioned conduct, Jane Doe has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

85.   As a direct and proximate result of the aforementioned conduct, Jane

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

86.     Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (BREACH OF THE DUTY OF UTMOST CARE)

87.     Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

88.     Uber was at all relevant times in the business of transporting the general public for profit, and held itself out to the public generally and indifferently for that purpose.

89.     Uber at all relevant times advertised its services to the general public.

90.     Uber at all relevant times charged standardized fees for its services, which were not separately negotiated with each passenger.

91.     In requesting that her fiancé summon an Uber ride for her, Jane Doe intended to become an Uber passenger.

92.     In encouraging customers to summon rides for others, and in accepting the ride request from Jane Doe's fiancé for a location Uber knew was remote from his location and thus must be for a person other than himself, Uber accepted Jane Doe as a passenger.

93.     In relying on Uber to send a driver to her location, and to provide trade dress visually identifying its driver, Jane Doe placed herself under Uber's control.

94.     Jane Doe went to the location designated as the site of departure at the appropriate time in an attempt to "board" her Uber ride using the manner and process prescribed by Uber.

95.      California Civil Code § 2100 thus obligated Uber to "use the utmost care and diligence for" Jane Doe's safe carriage, to "provide everything necessary for

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

20

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    that purpose," and to "exercise to that end a reasonable degree of skill," including

2    with respect to providing a safe place and manner for Jane Doe to locate her driver,

3    as well as providing a safe ride until she disembarked in a safe location.

4         96.    Uber negligently, and with gross negligence and recklessness, breached

5    the duty of utmost care that it owed to Jane Doe in that it:

6              a.  Undertook to provide riders, including Jane Doe, with a process and

7                  set of tools for obtaining a safe ride, but negligently established an

8                  unsafe process and unsafe set of tools, placing such riders at risk.

9              b.  Through its advertising, marketing, statements, processes, tools, and

10                 silences, negligently held out drivers whose vehicles bore the UBER

11                 decal as safe, vetted drivers working for Uber, whom Uber was

12                 recommending and endorsing to its riders.

13             c.  Negligently created the appearance that it was recommending and

14                 endorsing the Assailant, including by (1) making the UBER decal

15                 seem a reliable indicator of safety, (2) failing to secure its UBER

16                 decals generally, (3) providing UBER decals to the driver, and (4)

17                 failing to specifically recall its UBER decals from the driver once he

18                 proved to be dangerous.

19             d.  Failing to provide her with a safe process for entering the correct

20                 vehicle.

21        97.    As a direct and proximate result of the aforementioned conduct and

22   breach of duty, Jane Does has sustained and will sustain physical pain, mental

23   suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

24        98.    As a direct and proximate result of the aforementioned conduct and

25   breach of duty, Jane Doe has incurred economic damages, including lost past and

26   future income, lost earning capacity, and past and future medical expenses.

27        99.    Accordingly, Jane Doe is entitled to recovery against Uber in an amount

28   to be determined at trial.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

## FOURTH CAUSE OF ACTION

## (NEGLIGENCE)

100.   Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

101.   At all relevant times, Uber had a special relationship with Plaintiff Jane Doe in that it held itself out as offering safe rides to the public, and it accepted her ride request, agreed to provide her with a safe ride to her destination.

102.   Uber undertook to provide to Plaintiff Jane Doe a safe ride to her destination. It undertook to provide her with a secure and safe process for obtaining a safe ride. It undertook to recommend, certify, and identify for her a safe driver whom she could trust.

103.   Jane Doe relied on Uber to provide her with a safe ride, to certify a safe driver, and to provide her with a safe process matching her with the safe ride. She thereby entrusted herself to Uber's care, and allowed Uber to take charge of her for purposes of providing a safe ride to her destination. She gave up her normal power and tools of self-protection (for example, not getting into a stranger's car) and relied on Uber's process, recommendation, and certification.

104.   Uber negligently, and with gross negligence and recklessness, breached the duty of care that it owed to Jane Doe in that it:

　　　　　a. Undertook to provide riders, including Jane Doe, with a process and set of tools for obtaining a safe ride, but instead negligently, recklessly, and knowingly established an unsafe process and unsafe set of tools, placing such riders at risk.

　　　　　b. Through its advertising, marketing, statements, processes, tools, and silences, negligently, recklessly, and knowingly held out drivers whose vehicles bore the UBER decal as safe, vetted drivers working for Uber, whom Uber was recommending, certifying, and endorsing to its riders as safe and trustworthy.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

Case 3:19-cv-03310-JSC   Document 30   Filed 12/19/19   Page 23 of 25

        c.  Negligently, recklessly, and knowingly created the appearance that
            it was recommending and endorsing the Assailant, including by (1)
            making the UBER decal seem a reliable indicator of safety, (2) failing
            to secure its UBER decals generally, (3) providing UBER decals to
            the driver, and (4) failing to specifically recall its UBER decals from
            the driver once he proved to be dangerous.

    105.  By virtue of the aforementioned acts, omissions, and breaches, Uber
exposed Jane Doe to an unreasonable risk of harm, including the foreseeable harm of
a kidnapping and/or assault.

    106.  As a direct and proximate result of the aforementioned conduct and
breach of duty, Jane Does has sustained and will sustain physical pain, mental
suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

    107.  As a direct and proximate result of the aforementioned conduct and
breach of duty, Jane Doe has incurred economic damages, including lost past and
future income, lost earning capacity, and past and future medical expenses.

    Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be
determined at trial.

## **PRAYER FOR RELIEF**

    A.    For noneconomic damages according to proof at trial;

    B     For economic damages according to proof at trial;

    C.    For costs of suit and attorneys' fees to the fullest extent permitted by
law;

    D.    For pre-judgment and post-judgment interest according to law;

    E.    For punitive and exemplary damages in an amount that is sufficient to
punish Uber and deter it and others from engaging in similar conduct in the future;

    F.    For such other and further relief as the Court may deem proper.

LAW OFFICES OF
Walkup, Melodia, Kelly
& Schoenberger
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

23
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1 | Dated:  December 19, 2019          WALKUP, MELODIA, KELLY & SCHOENBERGER

2

3

4 |                                    By:    /s/ Sara M. Peters
                                            MATTHEW D. DAVIS
5 |                                         SARA M. PETERS
                                            ANDREW P. McDEVITT
6 |                                         Attorneys for Plaintiff Jane Doe

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1

**DEMAND FOR JURY TRIAL**

2

    Plaintiff hereby demands a jury trial.

3

Dated:  December 19, 2019          Walkup, Melodia, Kelly & Schoenberger

4

5

6

By:       /s/ Sara M. Peters

7

         MATTHEW D. DAVIS
         SARA M. PETERS

8

         ANDREW P. McDEVITT
         Attorneys for Plaintiff Jane Doe

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
Walkup, Melodia, Kelly
& Schoenberger
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210