

November 5, 2021

Hon. Jacqueline Scott Corley
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

      **Re:**    *Joint Letter Brief re Deposition of Uber's PMQ in Doe v. Uber, et al., Case No. 3:19-cv-03310-JSC*

Your Honor:

    The parties submit this joint letter brief, pursuant to the Court's Informal Discovery Conference process, regarding Plaintiff's request for a second deposition of Uber's corporate representative under Rule 30(b)(6) on 14 additional topics.

**Introduction**

    In July 2021, Plaintiff issued a Rule 30(b)(6) deposition notice on 9 topics (Exhibit 1). On August 9, 2021, Plaintiff took the deposition of Uber's corporate representative on 6 of those topics. The parties have deferred completing this deposition on the 3 remaining topics pending the completion of Uber's ongoing document production.

    On August 27, 2021, Plaintiff served a second Rule 30(b)(6) deposition notice requesting the deposition of Uber's corporate representative on 14 additional topics. (See Exhibit 2.) Uber contested the scope and relevance of topics 9-14, which the parties met and conferred about by Zoom on September 28. Plaintiff agreed to narrow the scope of topic 14. Uber maintains that topics 9-14 are irrelevant, overbroad, and not proportional to the needs of this case and has requested that Plaintiff withdraw these topics and corresponding requests for production of documents.

    On November 2, after Plaintiff sent Uber this brief, Uber informed Plaintiff that it believes Plaintiff must seek leave of court before being permitted to notice a second 30(b)(6) deposition which she has not done, that a second 30(b)(6) deposition would put Plaintiff over the 10-deposition limit which again requires leave of court, and that topics 1-8 in the second 30(b)(6) deposition notice are duplicative and cumulative of topics 7 and 9 from Plaintiff's first 30(b)(6) deposition notice. Thus, Uber's position is that it will not agree to produce a corporate representative on any of the noticed topics in the second 30(b)(6) deposition notice, without a court order.

152670246.2

Hon. Jacqueline Scott Corley
November 5, 2021
Page 2

**Plaintiff's Position**

<u>Topic 9</u>

One of Plaintiff's core theories is that Uber designed its ride-matching system such that riders relied on things that were unreliable (e.g., the stick-on logo decal or the fact a car was arriving at the right time and right place). Plaintiff contends that Uber should have designed a more secure matching system (whether using QR codes, unique four-digit codes, light up color bars or otherwise). But failing a redesign, Uber should have at a minimum warned its riders to always check the license plate and driver's photo, and explained to them that this was a critical safety measure. Uber disagrees.

After a few separate incidents in Boston and Chicago, where men posing as Uber drivers raped Uber riders, Uber rolled out a "Safe Ride Checklist" in January 2015 instructing its riders to confirm the license plate and name or picture of the driver as presented in the app.

Uber published these warnings **only** in Boston and Chicago—the cities where high-profile rape incidents were already dominating headlines. Uber's publication of a "Safe Ride Checklist" in these two markets tends to show: (1) Uber knew there was a problem with its system where people were posing as Uber drivers and sexually assaulting Uber riders, (2) Uber knew there was a need to shift the public's reliance to a secure method of identifying Uber drivers, and it knew how to do it, and (3) Uber chose to do so only in markets where high profile rapes were already dominating public attention, because Uber wanted to mitigate existing bad publicity but did not want to draw attention to its sexual assault problem where that attention did not already exist.

<u>Topics 10-13</u>

These topics seek information about Uber's communications to its riders about verifying their ride, as part of a campaign Uber initiated after the high-profile rape and murder of Samantha Josephson by a man pretending to be an Uber driver on March 29, 2019. Although the Josephson incident post-dates Plaintiff's, Uber's communications and warnings nonetheless are relevant to show feasibility. Plaintiff contends that Uber did not adequately warn its riders in general, or Plaintiff specifically, about people posing as Uber drivers and the associated risk of serious harm, such as kidnapping, rape and murder. Plaintiff also contends that Uber did not guard against this risk by ensuring all of its riders were relying on reliable identifiers. Uber's communications to its riders after a highly publicized and tragic event is relevant to contrast with Uber's communications prior to Plaintiff's incident, and to the show the feasibility and efficacy of such communications. It may also be necessary to help a jury understand the relevant timeline – since jurors may have seen Uber's more recent campaigns that post-date Plaintiff's incident.

152670246.2

Hon. Jacqueline Scott Corley
November 5, 2021
Page 3

**Topic 14**

Topic 14 is regarding the Uber Beacon, a system redesign that Uber started to roll out but for some reason never fully adopted. In December 2016, Uber began rolling out the Uber Beacon—a device that goes on a driver's windshield and uses color-pairing technology to help drivers and riders find each other. Riders control the color of the device so they can better identify their drivers. Uber first piloted this concept as SPOT in Seattle, presumably in an effort to eliminate what was a well-known issue at that time—riders getting into the wrong car.

The logical inference is that Uber's decision to develop the Beacon was, at least in part, borne out of its knowledge that riders too often get into the wrong cars. That is directly relevant to Uber's notice and knowledge that it had a problem that needed fixing. The efficacy of the Beacon is relevant to show that the system could have and should have been designed better. Plaintiff also needs to know why Uber never fully rolled out the project.

The parties agree that there is no evidence that Brandon Sherman was displaying the Uber Beacon at the time of the incident. Therefore, in response to meet and confer discussions, Plaintiff narrowed the topic to clarify that the sole focus was on Uber's knowledge of Uber riders getting into the wrong Uber car, and the feasibility of solutions (such as Beacon) to this problem.

Accordingly, Plaintiff proposed the following revised topic: "Information concerning the Uber Beacon, including but not limited to the decision to develop it, the bases for that decision, and the efficacy of it in matching Uber Riders with the correct Uber Drivers."

**Uber's Position**

Plaintiff has noticed more than ten depositions in this case. In addition, Plaintiff has already taken one 30(b)(6) deposition and must therefore seek leave of court before being permitted to notice a second 30(b)(6) deposition. The second 30(b)(6) deposition notice includes 14 topics and corresponding document requests that are duplicative and/or unnecessarily cumulative of the topics/document requests in Plaintiff's first 30(b)(6) deposition notice, overbroad, and neither relevant to any party's claims or defenses nor proportional to the needs of this case.

<u>Multiple Organization Depositions</u>. Though this issue has not been decided by the Ninth Circuit, district courts in California have proceeded under the view that the second deposition of an organization is subject to the one-deposition limitation and requires leave of court before it may go forward. *See*, *e.g.*, *Baleja v. Northrop Grumman Space &*

Hon. Jacqueline Scott Corley
November 5, 2021
Page 4

*Mission Sys. Corp. Salaried Pension Plan*, 2020 WL 6586310, at *3 (C.D. Cal. June 9, 2020) ("The practice in this district has been that the second deposition of a corporate defendant is subject to the one-deposition limitation and requires leave of court before it may go forward."); *Peck v. Cty. of Orange*, 2020 WL 3026377, at *1 (C.D. Cal. May 11, 2020) ("The law is settled that pursuant to Fed. R. Civ. P. 30(a)(2)(A)(ii), a party may not notice a second 30(b)(6) deposition of an organization without first obtaining leave of court to do so."); *Groupion, LLC v. Groupon, Inc.*, No. 11-0870 MEJ, 2012 WL 359699, at *5 (N.D. Cal. Feb. 2, 2012); *Blackwell v. City & Cty. of San Francisco*, No. C-07-4629 SBA (EMC), 2010 WL 2608330, at *1 (N.D. Cal. June 25, 2010); *Booker v. ConocoPhillips Co.*, No. C 07-384-CW, 2008 WL 11408436, at *2 (N.D. Cal. Apr. 25, 2008).

<u>Discovery Limitations Exceeded</u>. This proposed second 30(b)(6) deposition would cause Plaintiff to exceed the 10-deposition limit under FRCP 30(a)(2)(A)(i), given that she has already noticed ten depositions in this case. Again, this requires Plaintiff to seek leave of court which she failed to do.

Uber requests that the Court deny Plaintiff's request for leave to conduct a second 30(b)(6) deposition. If the Court is inclined to allow certain deposition topics to go forward, Uber respectfully requests that the Court limit the scope of this deposition to only topics 1-8 as set forth below.

### Topics 1-8

The first six topics in Plaintiff's second 30(b)(6) deposition notice seek testimony regarding Uber's communications to riders such as Plaintiff or her fiancé (e.g., all Uber Riders in Mexico) prior to August 14, 2018 about how they should verify that they are getting into the correct vehicle, why they should verify their ride, and how not to verify their ride. Topic 7 in the second 30(b)(6) deposition notice seeks testimony on any "assessments, examinations or analyses, to determine what Uber Riders relied on to Verify Their Ride and any associated risk, success or failure of that reliance." Lastly, Topic 8 in the second 30(b)(6) deposition notice seeks testimony on "[i]nformation concerning Uber's Check Your Ride Campaign, including but not limited to the reason(s) for creating it, the analyses and risk assessments used to develop it, the marketing plans for launching it, and the analyses of its efficacy."

Topics 1-8 in Plaintiff's second 30(b)(6) deposition notice are duplicative and unnecessarily cumulative of Topic(s) 7 and 9 in Plaintiff's first 30(b)(6) deposition notice which state as follows:

> 7. Any and all efforts by UBER, if any, to notify, warn, caution or advise users of the UBER APP and riders that persons: (a) who are not

Hon. Jacqueline Scott Corley
November 5, 2021
Page 5

>authorized UBER DRIVERS may nevertheless pretend to be, impersonate, pose as, or be mistaken to be UBER DRIVERS; and (b) may commit, or attempt to commit, batteries, sexual assaults or rapes of riders (limited in time from January 1, 2011 to August 18, 2018).
>
>9. All WRITINGS that REFLECT any efforts to notify, warn, guard against or protect riders, members of the public or users of the UBER APP from being battered, assaulted, sexually assaulted or raped by Brandon Sherman after UBER deactivated him as an UBER DRIVER, including, without limitation: (a) any effort to retrieve UBER decals, beacons or other material from Sherman; (b) any communication, notification, warning or report to law enforcement authorities about Sherman; and (c) any communication, notification, warning or report to any other rideshare company, such as LYFT, or other transportation companies about Sherman.

Rule 26(b)(2) requires the Court to limit the frequency or extent of discovery if "the discovery sought is unreasonably cumulative or duplicative," or "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. Proc. 26(b)(2)(c). In this case, Plaintiff has asked multiple individual witnesses about these same issues. The Court should preclude Plaintiff from taking Uber's deposition a second time on Topics 1-8.

**Topic 9**

Topic 9 seeks "[i]nformation concerning Uber's Check Your Ride Campaign specifically directed to the Boston and Chicago markets, including but not limited to the reason(s) for creating it, the analyses and risk assessments used to develop it, the marketing plans for launching it, and the analyses of its efficacy."

*First*, Plaintiff's alleged sexual assault occurred in San Mateo, California in August 2018. Any alleged safety awareness campaigns that Uber launched in markets on the other side of the country (e.g., Boston and Chicago) are neither relevant to any party's claims or defenses nor proportional to the needs of this case. To the best of Uber's current knowledge and belief, Plaintiff did not even have an Uber account in 2015.

*Second*, Plaintiff's discovery in this case has had very few boundaries, but it is time that some be effectuated. Plaintiff grossly misconstrues the evidence in this case in a strained attempt to create a self-serving narrative to support her ongoing fishing expedition in discovery -- which she admittedly intends to share with other lawyers to support separate litigation against Uber. In the *summer of 2017*, Uber launched a **nationwide** "Check Your Ride" campaign in the U.S. which stressed the importance of

152670246.2

Hon. Jacqueline Scott Corley
November 5, 2021
Page 6

leveraging all of the safety information readily provided to riders in the Uber App (e.g., make/model and color of the vehicle, the license plate number, and the driver's name and photograph) to verify that riders are getting into the correct vehicle and thus avoid potentially dangerous situations. Around the same time in Mexico, Uber launched a virtually identical safety awareness campaign called "Checa Tu Uber." The Check Your Ride campaign expanded upon a shorter list of Halloween safety tips from the fall of 2016 that Uber published on its online blog informing riders that, "[b]efore you get in the car, check the license plate number and look in the window to make sure the driver matches the photo." The Check Your Ride and Checa Tu Uber campaign messaging was posted on Uber's online U.S. and Mexico blogs, sent to riders through in-app communications, marketed through organic social media pushes, and extensively covered by multiple news outlets in both the U.S. and Mexico. In the *fall of 2017*, the Check Your Ride campaign was relaunched as a part of a back-to-school campaign to educate students to double check the driver and the car before starting a trip "to avoid potential bad actors and rideshare scams." Uber used similar marketing channels to push its safety messaging out to student riders. Thus, Plaintiff's suggestion that Uber chose to only warn its riders to always check the license plate and driver's photo "in markets where high profile rapes were already dominating public attention, because Uber wanted to mitigate existing bad publicity but did not want to draw attention to its sexual assault problem where that attention did not already exist" is demonstrably false.

Moreover, contrary to Plaintiff's argument, Uber has never instructed riders to rely on the presence of an Uber decal or the fact that "a car was arriving at the right time and right place" as indicators of identifying the correct vehicle. Multiple Uber employees have testified to this. Uber did precisely what Plaintiff accuses them of not doing — informing riders to always check the license plate and driver's photo, and explaining to them that this was a critical safety measure. **Clearly this important communication reached Plaintiff's fiancé because** after he ordered a ride for her through the Uber App, **he sent her a text message and provided her with the license plate number** of the car that would arrive for her. **She did not use the license plate information that he provided to her to "check her ride" and she got in the wrong car.**

Uber should not be required to produce a witness to discuss Topic 9.

**Topic 10-13**

Topics 10-13 seek information about Uber's communications to its riders about verifying their ride, as part of a renewed safety awareness campaign that Uber relaunched following the sexual assault and murder of a woman named Samantha Josephson on March 29, 2019 by a third-party criminal who pretended to be an authorized driver.

Hon. Jacqueline Scott Corley
November 5, 2021
Page 7

*First*, any alleged actions which Uber took that post-date the incident at issue in this case (i.e., after August 14, 2018) are neither relevant to any party's claims or defenses nor proportional to the needs of this case. *Second*, as Uber's current head of marketing for U.S. and Canada, Nicholas Silver, already testified in this case, Uber used the messaging and materials *from prior iterations* of the Check Your Ride campaign to quickly push out messages to riders and drivers in the wake of the Samantha Josephson incident. **This was not new messaging.** Therefore, Plaintiff's argument that Uber's communications to its riders after the Josephson incident "is relevant to contrast with Uber's communications prior to Plaintiff's incident, and to the show the feasibility and efficacy of such communications," simply fails.

*Third*, since no special relationship existed between Uber and Plaintiff, Plaintiff's failure to warn claims based on alleged nonfeasance are not actionable and she should not be able to seek 30(b)(6) deposition testimony based on this theory. *See*., *e.g., Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 619 (2018) (Generally, "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.").

*Fourth*, granting Plaintiff leave to depose Uber's corporate representative on Topics 10-13 would also be unduly burdensome. Uber has already produced extensive documents in this case related to the "Check Your Ride" safety awareness campaign (and earlier rider safety tips) that Uber launched prior to the date of the subject incident (August 14, 2018) for both the U.S. and Mexico markets.[1] If Plaintiff or her expert wishes to challenge the efficacy of these public communications, or to suggest that alternative communications were "feasible," she can do so without Uber's testimony on a safety awareness campaign that post-dated her alleged assault.

*Fifth*, Plaintiff's argument that testimony on these topics is "necessary to help a jury understand the relevant timeline – since jurors may have seen Uber's more recent campaigns that post-date Plaintiff's incident" is nonsensical. The Samantha Josephson incident (which involved a murder) has no relevance to this case. Uber's 2017-2018 Check Your Ride campaign materials and the testimony regarding these materials are relevant and have been produced. Plaintiff's discovery requests know no boundaries. This is unduly burdensome and Uber should not be compelled to produce a second witness to testify regarding information that has no bearing to Plaintiff's sole remaining amorphous negligence cause of action.

**Topic 14**

Topic 14 relates to the Uber Beacon. By Plaintiff's own admission, "there is no evidence that Brandon Sherman was displaying the Uber Beacon at the time of the incident" or that

---

[1] In Mexico, the Check Your Ride campaign was known as "Checa Tu Uber."

152670246.2

Hon. Jacqueline Scott Corley
November 5, 2021
Page 8

Plaintiff relied on the presence of an Uber Beacon in mistakenly entering Mr. Sherman's vehicle.  Nonetheless, Plaintiff now seeks Uber's corporate testimony on "[i]nformation concerning the Uber Beacon, including but not limited to the decision to develop it, the bases for that decision, and the efficacy of it in matching Uber Riders with the correct Uber Drivers."

The beacon simply has nothing to do with this case. The question at issue in this case is whether Uber owed a duty of care to this specific Plaintiff and, if a duty existed, whether Uber breached its duty of care to this specific Plaintiff.  But one would not know this by the breadth of Plaintiff's discovery on this and other topics.  The use of a beacon is not at issue.  Should Plaintiff's expert wish to comment on the beacon at trial, she may do so. Its existence is public knowledge.

The sole basis that Plaintiff provided as to why she believed this topic was relevant was that "it relates to the feasibility of a post-incident remedial measure."  There are several problems with Plaintiff's position.  *First*, the beacon was already in use at the time of the incident so by definition it could not be a "post-incident remedial measure."  *Second*, FRE 407 which excludes evidence of subsequent remedial measures to prove negligence, only permits evidence of subsequent remedial measures to prove the feasibility of such measures if feasibility is controverted by the defendant.  *See, e.g., Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 853 (4th Cir. 1980).  The feasability of the beacon is uncontroverted. *Third*, a broad deposition on all things related to the beacon is an overreach in discovery. This is not a proper topic for a time intensive and burdensome deposition, particularly where Plaintiff can present expert testimony on the issue of feasibility without having a corporate representative discuss "every basis for developing the Beacon."

Uber continues to develop various safety awareness campaigns and tools for riders to be able to identify their ride.  The Beacon was just one such tool.  By Plaintiff's logic, she should be entitled to seek corporate testimony on every concept that Uber every considered in developing its rider-driver matching system which is simply contrary to the law.  When, practically speaking, even if all cars had beacons, riders still should absolutely "check their ride" and compare the license plate of the car, the make, model and color of the car, and the photograph of the driver, before entering the vehicle. *Plaintiff here failed to do this.*

Plaintiff also argues in a self-serving fashion that "[t]he logical inference is that Uber's decision to develop the Beacon was, at least in part, borne out of its knowledge that riders too often get into the wrong cars." Uber has already produced documents relating to "prior similar incidents" where individuals alleged that they were assaulted after mistakenly entering the vehicle of a third-party criminal posing as someone that is authorized to use the driver version of the Uber App.  Plaintiff does not need corporate

Hon. Jacqueline Scott Corley
November 5, 2021
Page 9

testimony from Uber relating to the Beacon in order to establish Uber's alleged actual or constructive knowledge of this particular factual scenario as she argues.
Based on the foregoing, the Court should deny Plaintiff's request for leave to conduct a second 30(b)(6) deposition in its entirety. If the Court is inclined to allow certain deposition topics to go forward, Uber respectfully request that the Court limit this deposition to topics 1-8.

**Plaintiff's Reply**

**Deposition Limitations**

The Ninth Circuit has not ruled on whether a corporate defendant is subject to the one-deposition limitation, and district courts have taken different views. *See Heath v. Google*, 2018 WL 4491368, at *2 (N.D. Cal. Sept. 19, 2018). However, if necessary, Plaintiff seeks leave of the court to depose a second corporate representative. Despite using special interrogatories and the first 30(b)(6) deposition to try to identify people who can speak knowledgeably about safety issues, including what risks Uber knew, what risks it warned about, and how it warned about risks, it has been very difficult for Plaintiff to ascertain who are the ultimate decision-makers.

As the Court may recall, Plaintiff originally noticed a 30(b)(6) deposition with 70 categories in October 2020. After meeting and conferring from February to May, and receiving no dates and no offer of dates for the deposition, Plaintiff pared back to a 9-topic deposition notice, but acknowledged that there would likely need to be at least another 30(b)(6). With respect to the timing of that initial 30(b)(6), the Court ordered, "Given the nature of the case and relevant discovery, much of the information Plaintiff requires must come from a 30(b)(6) witness and it is unreasonable for Uber to hold Plaintiff to the seven-hour limit that is the default for every federal case, regardless of circumstances." (Docket No. 88).

Additionally, Plaintiff plans to seek leave of the court to take more than ten depositions, which Plaintiff believes there is good cause for given the complex nature of the case. However, Plaintiff initially noticed this deposition on August 27, and the parties have been meeting and conferring on the topics since then. It was not until two weeks ago when Plaintiff noticed two more depositions that she reached the limit.

**Topics 1-8**

Topics 1-8 in Plaintiff's second 30(b)(6) notice are not duplicative of topics 7 and 9 in the first 30(b)(6) notice. The latter focuses on any efforts by Uber to warn of the actual risk of being sexually assaulted by a fake Uber driver, or specifically by Brandon Sherman after Uber deactivated him. Whereas, topics 1-8 in the second notice focus on

Hon. Jacqueline Scott Corley
November 5, 2021
Page 10

any efforts made by Uber to communicate (and any communications actually made) to riders about what to do and what not to do in making sure they get into the correct Uber car, and why. In particular, topics 7 and 8 focus on Uber's efforts to understand the efficacy of its communications to riders in helping them get into the correct Uber car.

WALKUP, MELODIA, KELLY & SCHOENBERGER

By: _/s/ Sara M. Peters_
MATTHEW D. DAVIS
SARA M. PETERS
ANDREW P. McDEVITT
Attorneys for Plaintiff JANE DOE

PERKINS COIE LLP

By: _/s/ Julie L. Hussey_
JULIE L. HUSSEY
JULIAN FELDBEIN-VINDERMAN
Attorneys for Defendants and Third-Party Complainants UBER TECHNOLOGIES, INC., RASIER, LLC nd RASIER-CA, LLC (errnoneously sued as RASIER CA, LLC)

152670246.2