Julie L. Hussey, Bar No. 237711
JHussey@perkinscoie.com
Julian Feldbein-Vinderman, Bar No. 307838
JFeldbeinVinderman@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, CA  92130-2080
Telephone:  858.720.5700
Facsimile:  858.720.5799
Attorneys for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, an individual using a pseudonym,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.; RASIER, LLC; RASIER-CA, LLC,<br><br>Defendants. | Case No. 3:19-cv-03310-JSC<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC AND RASIER-CA, LLC'S NOTICE OF MOTION AND MOTION FOR PROTECTION**<br><br>Date: March 10, 2022<br>Time: 9 a.m.<br>Location: San Francisco Courthouse, Courtroom E—15th Floor<br>Judge: Hon. Jacqueline Scott Corley |

## TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 1

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 6

    I.     Legal Standard ............................................................................... 6

    II.    A protective order is necessary to protect Uber's right to a fair trial by an impartial jury, and to curtail repeated abuses by Plaintiff or her counsel.............. 6

    III.   Conclusion ...................................................................................... 11

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991)......................................................................................................6

*In re Dan Farr Prods.*,
    874 F.3d 590 (9th Cir. 2017).............................................................................6, 7, 8, 11

*Levine v. U.S. Dist. Ct. for Cent. Dist. of California*,
    764 F.2d 590 (9th Cir. 1985)................................................................................... passim

*Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995)..........................................................................................6

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 10, 2022 at 9:00 a.m. or as soon thereafter as this Motion may be heard in the above-entitled court, located at the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC ("Defendants"), by and through their counsel of record, will and hereby do, move the Court for protection from Plaintiff counsel's prejudicial extrajudicial statements to third parties.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities herein, the pleadings and papers on file in this action and all related cases, any argument and evidence to be presented at the hearing on this Motion, and any other matters that may properly come before the Court.

Dated:  February 1, 2022                              **PERKINS COIE LLP**

By: */s/ Julie L. Hussey*
Julie L. Hussey
JHussey@perkinscoie.com
Julian Feldbein-Vinderman
JFeldbeinvinderman@perkinscoie.com

Attorneys for Defendants
Uber Technologies, Inc., Rasier, LLC, and
Rasier-CA, LLC

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### INTRODUCTION

A courtroom is unique:  it provides a public space for parties to settle a dispute using independent fact finders who determine the truth from a set of disputed facts.  This critical function is protected by various mechanisms, such as the Federal Rules of Evidence and Civil Procedure.  Other public forums, such as the media, do not provide these safeguards.

This case involves a genuine controversy between Plaintiff and Uber, which Plaintiff chose to resolve in court.  Uber engaged in the discovery process in good faith, providing responsive documents and numerous depositions, and is prepared to submit its case to an independent trier of fact.  Instead of using the evidence developed in this case to present to an independent fact finder,[1] Plaintiff's counsel is using it to mount multiple attacks on Uber—and its non-party employees—in extrajudicial forums.  These tactics have already resulted in an inflammatory opinion piece in the New York Times (which had to be corrected by the opinion columnist due to factually incorrect information), and a misleading letter from Plaintiff's counsel to the California Public Utilities Commission ("CPUC").   This must stop.

The purpose of litigation is not to publicly attack a party or its employees in hopes the party will ultimately succumb to a war of attrition.  Nor is it permissible for a party to use the media and other public spheres to poison the prospective jury pool and deprive a party of its right to a fair trial.  But that is precisely what has happened here, and what will continue to happen absent judicial intervention.  A federal courtroom is a public forum, with public access, therefore there is no legitimate reason for Plaintiff to resort to extrajudicial tactics to "serve the public interest", as Plaintiff claims.  Uber respectfully requests the Court forbid Plaintiff or her counsel from engaging in future gamesmanship and litigate this case in the public courtroom.

The Court should grant Uber's motion.

---

[1] By filing this motion, Uber does not concede the admissibility of any evidence, an issue that shall subsequently be determined by the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

The Court is familiar with the facts.  Plaintiff alleges Uber is responsible for a tragic sexual assault perpetrated by an independent criminal actor who was not active on the Uber platform at the time it occurred.  *See generally* First Am. Compl., Dkt. No. 30.  The parties have exchanged discovery Uber has provided Plaintiff with responsive documents and numerous depositions.

In recent months, Plaintiff sought de-designation of certain deposition transcripts that were deemed "CONFIDENTIAL" per the terms of the parties' stipulated protective order.  Uber contested these de-designation attempts (*see* Uber's September 28, 2021 Motion to Maintain Confidentiality Designations Dkt. No. 113) but the Court denied Uber's motion.  *See* Order Re: Uber's Motion to Maintain Confidentiality Designations, Dkt. No. 130.  Following the Court's order, Plaintiff or her counsel promptly shared the depositions with, at minimum, The New York Times.[2]  *See* Uber's December 21, 2021 Motion to Maintain Confidentiality Designations, Dkt. No. 146-03.[3]  As detailed in that motion, and Uber's reply thereto (*see* Dkt. No. 161), the New York Times published an opinion piece based on slanted characterizations of the deposition testimony only *one day* after Uber sought to protect additional deposition testimony from gamesmanship.  The motion and reply further detail the mental and emotional distress that these tactics inflicted upon Uber's employees, none of whom had anything to do with the sexual assault carried out by a third-party criminal who Plaintiff has not sued.

Seemingly not content with using the media as a bullhorn to present a slanted account of this case, on January 5, 2022, on behalf of Plaintiff, Plaintiff's counsel wrote a letter to the CPUC (Uber's regulator), copying no fewer than 16 recipients of various third-party groups, launching a new round of unsubstantiated attacks against Uber.  January 5, 2021 Letter from Plaintiff's

---

[2] On January 19, 2022, Uber contacted Plaintiff's counsel and stated its intent to serve a request for production aimed at obtaining these communications, as well as any other similar communications made by Plaintiff's counsel to third parties.  Plaintiff's counsel objected to Uber's request.

[3] The Court denied Uber's motion without a hearing on January 20, 2022.  *See* Dkt. No. 163.

Counsel to CPUC (the "CPUC Letter"). The CPUC Letter contains rampant misstatements of Uber's past policies, which are "supported" by cherry-picked deposition excerpts that are twisted to fit Plaintiff's false narrative for maximum inflammatory effect. The following chart illustrates just *some* of the problematic statements in the CPUC Letter:

| Misrepresentation by Plaintiff | The Truth |
|---|---|
| "The declassified materials show that it is Uber's policy to permit an Uber driver accused of a first sexual assault to continue driving for the company, even in the face of corroborative evidence, unless there is 'conclusive' evidence that the driver committed the assault."<br><br>CPUC Letter Page 3. | Since mid-2018, Uber's policies have been that any user of the platform (driver or rider) would be permanently deactivated after a single report, supported by a statement of experience, of the following types of sexual assault<br><br>● Non-Consensual Sexual Penetration<br>● Non-Consensual Kissing - Sexual Body Part<br>● Non-Consensual Touching - Sexual Body Part<br>● Attempted Non-Consensual Sexual Penetration<br>● Non-Consensual Kissing - Non-Sexual Body Part<br><br>*unless* there is objective, contradictory evidence that shows the incident could not have taken place (e.g., GPS data). |
| "Uber strictly prohibits employees from reporting driver assaults of riders to the police, even when the driver admits to committing a rape."<br><br>CPUC Letter Page 4. | Uber's support logic, which governs the steps investigators are supposed to follow when investigating alleged sexual assaults on Uber's platform, does not contain any express prohibitions on reporting sexual assaults to the police. Uber's broader policy, however, is that it respects the wishes of the assault survivor, and does not itself report an alleged sexual assault to law enforcement because it is the survivor's choice whether to make such a report. This policy is consistent with advocate guidance Uber has received.<br><br>*See* Ex. A to February 1, 2022 Declaration of J. Feldbein-Vinderman. |
| The CPUC Letter contains a contextless, cherry-picked deposition citation from Briana | The incident in question was a physical assault of a driver. The deponent testified that she |

| | |
|---|---|
| Lambert, making it appear that supervisors denied her request to call the police following an alleged assault of a rider by an "Uber driver."<br><br>CPUC Letter Page 6. | was "provided instructions that would allow the police to reach out to us directly and request the information."<br><br>*See* Ex. B to February 1, 2022 Declaration of J. Feldbein-Vinderman. |
| "Uber's policy is to deactivate a driver after a second report of a sexual assault."<br><br>CPUC Letter Page 7. | Since mid-2018, Uber's policies have been that any user of the platform (driver or rider) would be permanently deactivated after a single report, supported by a statement of experience, of the following types of sexual assault<br><br>● Non-Consensual Sexual Penetration<br>● Non-Consensual Kissing - Sexual Body Part<br>● Non-Consensual Touching - Sexual Body Part<br>● Attempted Non-Consensual Sexual Penetration<br>● Non-Consensual Kissing - Non-Sexual Body Part<br><br>*unless* there is objective, contradictory evidence that shows the incident could not have taken place (e.g., GPS data). |
| "The declassified materials show that Uber has never issued a nonprivileged writing that memorializes its policy of prohibiting Uber employees from routing reports of sexual assaults to the police. Uber has not disclosed this policy in any 'outward facing' documents to the public."<br><br>CPUC Letter Page 7. | Uber's policy has been discussed publicly by media and Uber representatives, and is far from secret, as Plaintiff's counsel insinuates.<br><br>*See, e.g.,* Geoffrey A. Fowler, *Uber CEO Q&A: When rape happens in an Uber; who's responsible?*, Washington Post (Dec. 6, 2019) https://www.washingtonpost.com/technology/2019/12/06/uber-ceo-qa-when-rape-happens-an-uber-whos-responsible/; RALIANCE, *RALIANCE supports policies that empower survivors to make choices for themselves*, (Sept. 27, 2019) https://www.raliance.org/raliance-supports-policies-that-empower-survivors-to-make-choices-for-themselves/; NBC News, *Uber Shares Surprising Safety Findings* at 1 min. 30 sec., YouTube (Dec. 5, 2019) https://www.youtube.com/watch?v=mWjluaHRQiY. |

| | |
|---|---|
| "On December 5, 2017, the company received an email from a public safety officer that said, 'I wanted to make you aware of a situation at the University of South Carolina. Apparently there is a suspect posing as an Uber driver that is stalking women, committing battery and possible rape.' (Uber_DOE_0004371.) The declassified materials show that Uber did almost nothing to reduce the risk of this foreseeable harm reoccurring, but instead limited its response to public relations damage control."<br><br>CPUC Letter Page 14. | Uber sent its Check Your Ride information to the University of South Carolina campus police and deployed in-app messaging to riders and drivers with the check your ride campaign safety tips.  Also, Uber sent a one-pager of its check your ride safety tips to be disseminated to students on campus. |
| The CPUC Letter insinuates Brittany Anthony was Head of Global Women's Safety Policy since February 2019.<br><br>CPUC Page 14. | Ms. Anthony did not assume her role until 2020.<br><br>*See* Ex. C to February 1, 2022 Declaration of J. Feldbein-Vinderman. |

Even giving Plaintiff and her counsel the benefit of the doubt, the above are examples of disputes that should be resolved by an independent fact finder.[4]  If Plaintiff's counsel wants to provide mischaracterized interpretations of, and blatantly inaccurate information regarding, Uber's policies to a jury in a public courtroom, they may do so, but the truth is for the jury to decide, based solely on admissible evidence.

Every extrajudicial attack launched by Plaintiff's counsel in the months leading to trial impermissibly taints the prospective jury pool and impacts Uber's right to a fair trial by an impartial jury.  Whether Plaintiff counsel's aim is to avoid a trial by impartial jury, or simply attempt to embarrass Uber and most importantly its employees who were not even remotely involved in the attack against Plaintiff, that damage is ongoing.  The Court should prohibit such conduct.

---

[4] Again, Uber reserves the right to challenge, *in limine*, or otherwise, any evidence or improper lines of argument that may be proffered by Plaintiff.

**ARGUMENT**

**I.     Legal Standard**

The Ninth Circuit has upheld protective orders to guard against a counsel's extrajudicial statements that risk compromising a party's right to a trial by an impartial jury.  *Levine v. U.S. Dist. Ct. for Cent. Dist. of California*, 764 F.2d 590, 601 (9th Cir. 1985).  For orders seeking to restrain counsel or parties, such as the one Uber seeks, "[t]he Supreme Court has suggested that it is appropriate to impose greater restrictions on the free speech rights of trial participants than on the rights of nonparticipants."  *Id.*; *see also In re Dan Farr Prods.*, 874 F.3d 590, 593 n.3 (9th Cir. 2017).  (noting *Levine's* "recognition that **a lower standard applies to prior restraints of attorneys** participating in a case" (emphasis added)).

"The Supreme Court has held that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice."  *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1442 (9th Cir. 1995) *citing Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074–75 (1991).  Consequently, the movant must show that an attorney's extrajudicial statements have a "substantial likelihood of material[ly] prejudicing" a matter.  *Gentile*, 501 U.S. at 1074–75.  Additionally, an order limiting speech must be narrowly drawn, and less restrictive alternatives must not be available.  *Levine*, 764 F.2d at 595.

**II.     A protective order is necessary to protect Uber's right to a fair trial by an impartial jury, and to curtail repeated abuses by Plaintiff or her counsel.**

At the outset, Uber wants to be clear as to the scope of relief sought in its motion for a protective order.  Uber is not asking to conceal documents from public view, nor is it asking the Court to restrict the activities of any third party, including the media.  Uber only asks this Court to prohibit Plaintiff or her counsel from making misleading statements in the public sphere in an impermissible attempt to influence this case.

-6-

A.      **These actions present a substantial likelihood of material harm to Uber's right to a fair trial.**

The Ninth Circuit's *Levine* decision controls.  There, a party's counsel gave interviews with the Los Angeles Times, where counsel, among other things: discussed the merits of the case; accused the FBI of "misleading" the federal government, resulting in false charges; stated that federal prosecutors made "incorrect assessments"; and commented on the sufficiency of the evidence.  *Levine*, 764 F.2d at 592.[5]  Following the issuance of the article, the district court forbade all counsel from speaking to the media regarding any aspects of the case that "bears upon the merits to be resolved by the jury."  *Id.*

In upholding the district court's order, the Ninth Circuit observed that "several other courts have considered similar restraining orders" and "[t]he **overwhelming majority of those courts have upheld the restraining orders**." *Id.* at 596 (emphasis added).  The court further noted that it could only locate two decisions where orders involving trial participants were overturned, and those rulings were based on the inadequacy of the district court's findings or overbreadth.  *Id.*  In reviewing the district court's findings, the Ninth Circuit observed that, although publicity further away from a trial may have less of a prejudicial effect, it is important to consider "the circus-like environment that surrounds highly publicized trials" that "threatens the integrity of the judicial system." *Id.* at 598.

Along that line, the Ninth Circuit cited the widespread publicity that the case received, not only in the Los Angeles Times, but in other forums, and cited with approval the district court's conclusion that "the level of publicity would increase as trial approached." *Id.*  Finally, the Ninth Circuit focused on the fact that the cause of the prejudicial publicity was the statements of the trial counsel and noted that "[b]oth the Supreme Court and this court have recognized the effectiveness of restraining orders against trial participants." *Id.*

The Ninth Circuit revisited the issue most recently in 2017, when it vacated a district court's orders prohibiting a company from posting information on its website about ongoing

---

[5] Although Levine involved a criminal matter, as the Ninth Circuit stated, "[t]he mere fact that a threat to the integrity of the judicial process is created by a private litigant, rather than by the government, is of little consequence." *Levine*, 764 F.2d at 597.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PROTECTION
CASE NO. 3:19-CV-03310-JSC

trademark litigation.  *In re Dan Farr Prods.*, 874 F.3d at 591.  Although the Ninth Circuit relied

on *Levine*, the *Dan Farr* case differs from Levine and this case in several key respects.  First, as

the Ninth Circuit observed, *Dan Farr* was a "run-of the mill trademark proceeding", as opposed

to a case involving sensitive topics or "grisly crimes."  *Id*. at 596.  *Second*, the prohibition on

speech was not targeted at counsel, but at a public company, therefore the court required a more

stringent showing that the company's conduct represented a "clear and present danger" to fair

trial.  *Third*, the Ninth Circuit rejected both the district court's order, and the petitioner's briefing,

for failure to establish the reach of the company's statements.  None of those concerns are present

in this case.

Here, Plaintiff counsel's conduct mirrors that of counsel in *Levine*.  As described in

Uber's Reply to its December 21, 2021 Motion to Maintain Confidentiality Designations (Dkt.

No. 161), Plaintiff's actions resulted in an inflammatory opinion piece that was factually incorrect

and required a public correction by the New York Times.  The breadth of the public

dissemination of that piece is alarming:

- The New York Times is an international paper with **8.4 million subscribers**.[6]

- The piece was posted on the New York Times Opinion Section's Facebook page, which is liked by **747,737 individuals**, and followed by **884,676 individuals**.[7]

- According to Twitter metrics, the piece was shared 56 times, including by five individuals who, just among themselves, possessed a total follower count of more than **183,000 individuals**.[8]

- Seventy-two percent of New York Times readers possess a college degree, and 49 percent of individuals over 25 years old in the Bay Area possess a college degree, tied for highest in the nation.[9]

---

[6] *See* Marc Tracy, *New York Times Adds 455,000 Subscriptions in Third Quarter*, N.Y. Times (Nov. 3, 2021), https://www.nytimes.com/2021/11/03/business/media/new-york-times-3q-earnings.html.

[7] *See* Ex. D to February 1, 2022 Declaration of J. Feldbein-Vinderman.

[8] *See* Ex. E to February 1, 2022 Declaration of J. Feldbein-Vinderman.

[9] *See* Pew Research Center, *Demographic differences emerge among those who rely on each outlet as their main political news source*, (March 31, 2020) https://www.pewresearch.org/fact-tank/2020/04/01/americans-main-sources-for-political-news-vary-by-party-and-age/ft_2020-04-01_newssources_04/ , and Bay Area Council Economic

- Ninety-one percent of New York Times readers identify as Democrat and, in 2016, more than 80 percent of Bay Area residents voted Democrat.[10]

Plaintiff counsel's misstatements in the CPUC Letter are equally, if not more, egregious. That letter—which was submitted to the CPUC and various third parties, including the San Francisco City Attorney and chapters of the Rape, Abuse & Incest National Network—contains no fewer than twelve inflammatory misrepresentations from Plaintiff's counsel. For example, on Page 3 (and elsewhere), Plaintiff's letter states that Uber "strictly prohibits employees from reporting driver assaults of riders to the police, even when the driver admits to committing a rape." No such prohibition exists. For another example, on Page 6, Plaintiff insinuates that a cherry-picked deposition excerpt pertains to an assault by a driver on a passenger, where in fact the inverse is true. Plaintiff counsel's assertions are simply incorrect, and Uber will combat them in the courtroom if necessary. Prior to trial, however, Uber should not also be forced to fight these incorrect statements in the press, before the CPUC, in the court of public opinion, or anywhere else that Plaintiff's sees fit to launch inflammatory attacks.

There is no question that Plaintiff's impermissible tactics have a substantial likelihood of materially prejudicing Uber's right to a fair trial. Like *Levine*, this case, which involves a tragic and sensitive sexual assault and a large corporation, is receiving widespread publicity, which will only increase as trial approaches. *Levine*, 764 F.2d at 598. The publicity issues here are a direct result of the actions of Plaintiff's counsel who, just like the counsel in *Levine*, made inflammatory allegations to the CPUC and others about Uber using "misleading" tactics. *Compare* CPUC Letter at Page 1, with *Levine*, 764 F.2d at 592. Misleading extrajudicial accusations that Uber, or its rank-and-file employees, are somehow responsible for a sexual assault are prejudicial and

Institute, *Economic Profile 2020: The Evolution of the Bay Area Higher Education System in the Wake of COVID-19*, http://www.bayareaeconomy.org/report/economic-profile-2020-the-evolution-of-the-bay-area-higher-education-system-in-the-wake-of-covid-19/.

[10] *See* Pew Research Center, *U.S. adults who name Fox News or MSNBC as their main political news source are equally partisan*, (March 31, 2020) https://www.pewresearch.org/fact-tank/2020/04/01/americans-main-sources-for-political-news-vary-by-party-and-age/ft_2020-04-01_newssources_02/ , and Erin McGhee, *California's Political Geography 2020*, Public Policy Institute of California (Feb. 2020) https://www.ppic.org/wp-content/uploads/californias-political-geography-2020.pdf.

1   appalling.  As illustrated above, the reach of Plaintiff counsel's conduct with just one opinion

2   piece in the New York Times is bad enough; this Court must stop counsel before even more of

3   the prospective jury pool is tainted.

4        **B.    A narrowly tailored order prohibiting Plaintiff or her counsel from discussing this case to third parties is both judicially appropriate and the least restrictive means to preserve Uber's rights.**

5

6        Given the sensitivity surrounding prohibition of speech, Uber recognizes that any order

7   issued by the Court must both be narrowly tailored and constitute the least restrictive means

8   possible.  *Levine* again provides controlling instruction for the form and scope of such an order.

9   There, when determining the proper scope of an order prohibiting attorneys from speaking to the

10  media, the Ninth Circuit stated it was "appropriate" to limit the attorney from making

11  extrajudicial statements on the following subjects:

12        (1) The character, credibility, or reputation of a party;

13        (2) The identity of a witness or the expected testimony of a party or a witness;

14        (3) The contents of any pretrial confession, admission, or statement given by a defendant or that person's refusal or failure to make a statement;

15

16        (4) The identity or nature of physical evidence expected to be presented or the absence of such physical evidence;

17

        (5) The strengths or weaknesses of the case of either party; and

18

19        (6) Any other information the lawyer knows or reasonably should know is likely to be inadmissible as evidence and would create a substantial risk of prejudice if disclosed.

20  *Levine*, 764 F.2d at 599.  This is precisely the type of conduct Uber seeks to proscribe.  If

21  Plaintiff's counsel seeks to offer comment on these issues, it should do so in the courtroom, in

22  accordance with the applicable rules of law and evidence.

23        Such a narrowly-tailored order is the least restrictive means available to protect Uber's

24  right to a fair trial.  Other mechanisms are simply insufficient, especially given the conduct of

25  Plaintiff's counsel.  For example, the Ninth Circuit has rejected *voir dire* as a curative to bias

26  when the prejudicial publicity was caused by counsel for a trial participant:

27        The petitioners argue that searching *voir dire* would eliminate any bias caused by pretrial publicity. While that may be true, we agree with the

28

-10-

district court that *voir dire* cannot eliminate prejudice caused by publicity during the trial. **Moreover, *voir dire* <u>cannot alleviate the harm</u> to the integrity of the judicial process caused by the extrajudicial statements of trial participants**.

*Id*. at 600 (emphasis added); *compare with Dan Farr*, 874 F.3d at 595–96 (finding *voir dire* an appropriate alternative in a situation where counsel was not the source of prejudicial publicity). And, although the Ninth Circuit has observed a "rebuttable presumption that juries follow jury instructions", *Dan Farr*, 874 F.3d at 595, it has more importantly stated that "jury instructions are often an ineffective remedy" that "cannot address the threat to judicial integrity posed by prejudicial extrajudicial statements." *Levine*, 764 F.2d at 600. A change of venue similarly fails as a curative because "the problem is with curbing unwarranted statements by counsel, and a change of venue or postponement would simply have no effect on the problem." *Id*. And, not only is juror sequestration not even possible at this time but, as the Ninth Circuit has further observed, "[t]he negative effects of sequestration are well documented." *Id*.

Plaintiff's response is likely to invoke all of these, and potentially other, alleged curatives in lieu of the protections Uber seeks. Setting aside the fact that the Ninth Circuit has rejected such measures in analogous situations, Uber poses a final question: Why must the Court, Uber, and a prospective venire jump through so many hoops to guarantee Plaintiff's counsel an unfettered ability to make prejudicial misstatements in a public forum? The answer, of course, is that this makes no sense. The Court should grant Uber's motion.

**III.    Conclusion**

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for protection.

1

2
Dated:  February 1, 2022                    **PERKINS COIE LLP**

3
                                          By: */s/ Julie L. Hussey*

4
                                              Julie L. Hussey
                                              JHussey@perkinscoie.com

5
                                              Julian Feldbein-Vinderman
                                              JFeldbeinvinderman@perkinscoie.com

6

7
                                          Attorneys for Defendants
                                          Uber Technologies, Inc., Rasier, LLC, and

8
                                          Rasier-CA, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-12-