LAW OFFICES OF
WALKUP, MELODIA, KELLY & SCHOENBERGER
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
ANDREW P. McDEVITT (State Bar #271371)
amcdevitt@walkuplawoffice.com
KELSEY CONSTANTIN (State Bar #336666)
kconstantin@WalkupLawOffice.com
**ATTORNEYS FOR PLAINTIFF JANE DOE**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, an individual using a pseudonym,<br><br>                Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LCC, RASIER CA, LLC,<br><br>                Defendants. | Case No. 3:19-cv-03310-JSC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Jacqueline Scott Corley<br>Date:    August 16, 2022<br>Time:    9:00 a.m.<br>Crtrm.:  E<br><br>**Assigned to Magistrate Judge Jacqueline Scott Corley**<br><br>Action Filed:   June 12, 2019<br>Trial Date:    September 12, 2022 |

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 1

II. RELEVANT FACTS.................................................................................................. 2

   A.  Uber Knew Its Riders Were Being Harmed by Sexual Predators Posing as Uber Drivers, but Chose Not to Acknowledge, Study, or Address this Risk. ................................................ 2

      1.  Even before launching its peer-to-peer transportation service, Uber knew or should have known there was a risk sexual predators would exploit it to pose as Uber drivers. ........ 2

      2.  After launching its peer-to-peer transportation service, Uber knew for a fact that sexual predators were regularly exploiting its service to pose as Uber drivers and assault Uber riders. 3

      3.  Uber chose not to gather, track, or study data about sexual predators posing as Uber drivers, nor to conduct any analyses to address the root cause of the problem. ..................... 4

   B.  Uber Negligently Gave Drivers, Including Known Sexual Predator Sherman, the Tools to Easily Pose as Uber Drivers and Sexually Assault Riders....................................................... 5

      1.  Uber knew or should have known that riders would view vehicles bearing its trade dress as affiliated with Uber and therefore trustworthy...................................................... 5

      2.  Despite the known risks, Uber chose to use inexpensive and easy-to-duplicate logo decals as the way to identify an Uber................................................................................ 6

      3.  Before Ms. Doe was attacked, Uber knew that sexual predators with access to its trade dress were exploiting Uber's goodwill to gain access to Uber's riders................................. 7

      4.  Uber knew its former driver Brandon Sherman was a sexual predator but, despite the foreseeable risk, let him keep its trade dress. ..................................................................... 8

   C.  Uber Enabled and Emboldened Sherman to Continue Preying on Its Riders by Dealing Lightly with His Assaults, and Shielding Him from Criminal Consequences........................... 9

      1.  Uber dealt lightly with Sherman's first sexual assault and kidnapping, describing it as "flirtation" and encouraging him to continue driving........................................................... 9

      2.  Uber shielded Mr. Sherman from legal consequences for his prior sexual assaults by making it difficult and confusing for potential victims to report to law enforcement. .......... 10

      3.  Uber took no action to protect its riders from the foreseeable risk that Mr. Sherman would exploit its platform to assault more women. ....................................................... 11

   D.  Uber Negligently Increased the Risk of Sexual Assault Even Further by Allowing Ride Requests on Behalf of Inexperienced Guest Riders with No Working Phones........................ 12

      1.  Uber does not tell its riders that it is dangerous to rely on its trade dress to identify safe rides, nor does it give them clear and consistent directions on what they should use instead of the trade dress..................................................................................................... 12

      2.  Uber further increases the risk of sexual assault by allowing App users to call for a ride on behalf of a third-party guest at a remote location even if the guest is inexperienced with Uber or does not have a working phone. ...................................................................... 14

   E.  Uber's negligence was a substantial factor in causing harm to Plaintiff Jane Doe. .......... 14

III. ARGUMENT............................................................................................................ 16

   A.  Applicable Standard.................................................................................................. 16

   B.  Summary Judgment Should Be Denied Because There Is a Genuine Dispute of Material Fact as to Whether Uber Delivered Its Service in a Manner that Foreseeably and Unreasonably Increased the Risk of Assault. ............................................................................................ 16

1    1. Under California law, Uber owes its riders a duty not to deliver its services in a manner that foreseeably and unreasonably increases the risk of assault...................................16

2     (a) Binding California Supreme Court authority supports finding a duty....................16

3     (b) The recent California appellate decision is a non-binding outlier..........................19

4    2. There Is a Genuine Issue of Disputed Fact as to Whether Uber Foreseeably and Unreasonably Increased the Risk of Sexual Assault. .......................................................20

5  C. Summary Judgment Should Also Be Denied Because Uber Undertook Services That It Should Have Recognized Were Necessary for the Protection of Its Riders............................22

6  D. Summary Judgment Should Also Be Denied Because Uber Owed, and Violated, a Duty to Protect Jane Doe Based on a Special Relationship Characterized by Her Dependence on Uber's Ride-Matching Service...................................................................................................................22

8  E. The Rowland Factors Do Not Support Limiting Uber's Duty .......................................24

  F. Proximate Cause and Superseding Intervening Cause ..................................................24

9  G. Punitive Damages ..........................................................................................................25

10 IV. CONCLUSION ......................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

*Benton v. Sloss*
  38 Cal.2d 399 (1952) ...................................................................................... 25
*Brown v. USA Taekwondo*
  11 Cal.5th 204 (2021) .............................................................................. passim
*Dix v. Live Nation Entertainment, Inc.*
  56 Cal.App.5th 590 (2020) ............................................................................. 23
*Doe v. Roman Catholic Archbishop of Los Angeles*
  70 Cal.App.5th 657 (2021) ............................................................................. 24
*Hahn v. Select Portfolio Servicing, Inc.*
  424 F.Supp.3d 614 (N.D. Cal. 2020) ............................................................. 16
*In re Kirkland*
  915 F.2d 1236 (9th Cir. 1990 .......................................................................... 16
*Intercargo Ins. Co. v. Burlington Northern Santa Fe RR*
  185 F.Supp.2d 110 (C.D. Cal. 2001) .............................................................. 22
*Jane Doe No. 1 v. Uber Techs, Inc.*
  79 Cal. App. 5th 410 (2022) .......................................................... 1, 19, 20, 21
*Johnson & Johnson Talcum Powder Cases*
  37 Cal. App. 5th 292, 332 (2019) ................................................................... 25
*Lugtu v. California Highway Patrol*
  26 Cal.4th 703 (2001) ........................................................................ 1, 18, 20
*McEvoy v. American Pool Corp.*
  32 Cal.2d 295 (1948) ...................................................... 1, 19, 21, 25
*P.S.M. Holding Corp. v. Nat'l Farm Fin. Corp.*
  884 F.3d 812 (9th Cir. 2018) ..................................................................... 16, 17
*Paz v. State of California*
  22 Cal.4th 550 (2000) ..................................................................................... 22
*Reeves v. Sanderson Plumbing Products*
  530 U.S. 133 (2000) ........................................................................................ 16
*Regents of University of California v. Superior Court*
  4 Cal.5th 607 (2018) ....................................................................... 22, 23, 24
*Richardson, infra*
  44 Cal.2d 772 ............................................................................................ passim
*Royalty Carpet Mills, Inc. v. City of Irvine*
  125 Cal.App.4th 1110 (2005) .......................................................................... 21
*Sakiyama v. AMF Bowling Centers, Inc.*
  110 Cal.App.4th 398 (2003) ............................................................................ 20
*Tolan v. Cotton*
  572 U.S. 650, 651 (2014) ................................................................................ 16
*Tompkins v. 23andMe, Inc.*
  834 F.3d 1019 (9th Cir. 2016) ........................................................................ 16
*Weirum v. RKO General, Inc.*
  15 Cal.3d 40 (1975 ............................................................. 1, 17, 18, 20
*Williams v. State of California*
  34 Cal.3d 18 (1983) ................................................................................. 18, 22

**Statutes**

Cal. Civ. Code § 3294(c) ................................................................................ 25
California Civil Code 3294(a ......................................................................... 25
California Evid. Code sec. 412 ......................................................................... 7
Fed. Rules of Evid., Rule 302 .......................................................................... 7

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1

**Other Authorities**

2

Bamberger & Lobel, Platform Market Power (2017) 32 Berkeley Tech. L.J. 1051, 1056 ............6
Restatement (Second) of Torts § 314A & *cmt. b* (1965)..........................................................23
3   Restatement (Second) of Torts § 324A (1965)......................................................................22
Restatement (Third) of Torts § 37 & *cmt. c* (Am. Law Inst. 1975) ...................................17, 21
4   Restatement of Torts § 449 (1965 ....................................................................................25
Restatement of Torts section 449 .....................................................................................24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

# I.      INTRODUCTION

Uber takes the position, in reliance on *Jane Doe No. 1 v. Uber Techs, Inc.*, *infra*, that, so long as it does not actively encourage criminals to sexually assault its riders and so long as sexual assault is not a "component" of its business model, it owes its riders no duty to protect them from the sexual predators who exploit its platform. This position is not only repugnant to basic notions of accountability and common sense, but it is also inconsistent with California law. As California's highest court has reaffirmed time and again, California follows the Restatement (Third) of Torts in holding that companies like Uber have a duty not to unreasonably increase the risk of injury to others, including foreseeable injury from third party criminal conduct. *See Brown*, *infra*, 11 Cal.5th 204; *Lugtu*, *infra*, 26 Cal.4th 703; *Weirum*, *infra*, 15 Cal.3d 40; *Richardson*, *infra*, 44 Cal.2d 772; and *McEvoy*, *infra*, 32 Cal.2d 295.

There is abundant evidence (and certainly at least a genuine dispute of material fact) that Uber breached this duty. Uber took over the transportation industry by convincing riders it is safe to get into a stranger's personal vehicle, isolated and alone, so long as the stranger is affiliated with Uber. It communicates this affiliation using its trade dress. Yet, for the sake of expedience, it chooses to use a paper decal as its trade dress and makes no effort to recover its trade dress from known sex offenders. It knows that "there have been numerous incidents and allegations [of] individuals impersonating Drivers, sexually assaulting, abusing, kidnapping and/or fatally injuring consumers…" (RFJN Exh. A at p. 17.) By May 2017 it knew these incidents had "reached crisis levels." (Peters Decl., Exh. 3 at 158:6-160:13.) Nevertheless, Uber has never considered the possibility that it might bear some responsibility for these incidents. If a woman accidentally gets into the wrong Uber and is assaulted, Uber categorizes that incident as "invalid." It does not track these incidents, nor study their root causes, nor tell its riders not to rely on the trade dress.

With respect to Mr. Sherman in particular, he was a former driver on Uber's platform. Twice within six months, Uber riders credibly accused him of kidnapping and sexually assaulting women on its platform. The first time, despite GPS evidence that corroborated the rider's account, Uber refused to deactivate him since the evidence was not "conclusive." It sent him a letter downplaying his conduct, saying that he may have been misperceived as being "flirtatious," and

1    reassuring him that he was a "valued partner." And it shielded him from a criminal investigation

2    by misleading the reporting party to think that Uber was already communicating with law

3    enforcement. After the second reported assault, Uber deactivated Sherman but allowed him to

4    keep the trade dress that would let him to continue exploiting its platform. Finally, rather than

5    communicate to Jane Doe and other riders what Uber alone knew – that its trade dress was an

6    unreliable indicator of trustworthiness and that safety required riders to always check the license

7    plate – Uber actively advertised that its App users could call rides for guests even if those guests

8    did not have a working smartphone. That is exactly what Jane Doe's boyfriend did for her. Ms.

9    Doe's phone battery was dead and, seeing the trade dress on Mr. Sherman's window, she got into

10   his vehicle. A harrowing ordeal followed.

There is ample evidence that Uber breached its duty, and this case should go to a jury.

## II.    RELEVANT FACTS

### A.    Uber Knew Its Riders Were Being Harmed by Sexual Predators Posing as Uber Drivers, but Chose Not to Acknowledge, Study, or Address this Risk.

#### 1.    Even before launching its peer-to-peer transportation service, Uber knew or should have known there was a risk sexual predators would exploit it to pose as Uber drivers.

Uber is a novel form of application-supported transportation company. RFJN Exh. B

(CPUC Decision 13-09-045) at pp. 2 & 68. "Fundamentally the way that the Uber app works is it

matches riders who need a ride with drivers who are online and available to provide a ride." Decl.

of Sara M. Peters ("Peters Decl."), Exh. 4 (Baker Depo, Vol. I) at 29:10-16. The "peer-to-peer"

ride takes place in a non-professional driver's personal vehicle. RFJN, Exh. B, at p. 2. The rider

and driver are almost always strangers to one another. Peters Decl., Exh. 11 (Silver Depo.) at

37:18-38:7. By placing these two strangers together in an isolated setting, i.e., a private vehicle,

with limited means for the rider to escape, Uber creates a foreseeable opportunity for sexual

violence. Decl. of Elizabeth Jeglic, Ph.D. ("Jeglic Decl.") at ¶ 5. It should have used "failure mode

and effects analysis" to identify, assess, and mitigate the risk that its platform would create

opportunities for criminals, including sexual predators, to pose as Uber drivers. Jeglic Decl. at

¶9(b); Decl. of Cynthia Rando ("Rando Decl.") at ¶ 19; Decl. of Joseph A. Donndelinger

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

2

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1  ("Donndelinger Decl.") at ¶¶ 14-21.

2      **2.      After launching its peer-to-peer transportation service, Uber knew for**
         **a fact that sexual predators were regularly exploiting its service to pose**
3       **as Uber drivers and assault Uber riders.**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

Exh. E, Uber Comment regarding Rulemaking 12-12-011, p. 2 (2013 launch).

1

2

3

4          In 2018, using a simple google search, Uber found 35 reports in 2017 and 24

5  reports in 2018 of people posing as Uber drivers to assault riders. Peters Decl., Exh. 3 at 90:17-

6  94:22, 141:6-23, Exh. 9 to Page Depo, Vol. III; Peters Decl., Exh. 2 at 287:17-293:11, Exh. 6 to

7  Page Depo, Vol. II. Based on the Google search, and known underreporting, Uber estimated that

8  these incidents occurred once per week. Peters Decl., Exh. 3 at 161:17-162:1, Exh. 9 to Page

9  Depo, Vol. III.

10          In May of 2017, Uber's policy team stated that the issue of imposter drivers had "**reached**

11  **crisis levels**." Peters Decl., Exh. 3 at 158:6-160:13, emphasis added. In its 2019 Annual Report,

12  unlike in its rider-facing communications, Uber acknowledged: "There have been **numerous**

13  **incidents** and allegations worldwide of Drivers, or **individuals impersonating Drivers**, sexually

14  assaulting, abusing, kidnapping and/or fatally injuring consumers, or otherwise engaging in

15  criminal activity while using our platform or claiming to use our platform." RFJN, Exh. A (2019

16  Annual Report) at p. 17, emphasis added; Peters Decl., Exh. 1 at 20:3-23:2.

17          **3.     Uber chose not to gather, track, or study data about sexual predators
18                    posing as Uber drivers, nor to conduct any analyses to address the root
                      cause of the problem.**

19          Uber should have realized these incidents constituted a situational risk for its customers,

20  which it had the capability and moral obligation to address in an evidence-based manner. Jeglic

21  Decl. at ¶¶ 5-11; Rando Decl. at ¶¶ 11-23; Donndelinger Decl. at ¶¶ 24-30 & 39-51.

22          Uber did not do so. Instead, if an Uber rider accidentally got into the wrong vehicle, Uber

23  dismissed that report as "**invalid**." Peters Decl., Exh. 5 (Depo. of Matthew Baker, Vol. II) at

24  115:14-119:19. Uber places the blame for these incidents on the rider, saying "if somebody's not

25  getting into the right car, that means they're not verifying the information that's provided." Peters

26  Decl., Exh. 1 at 178:8-179:2. Uber excludes these incidents from its public safety reporting. Peters

27  Decl., Exh. 8 (Depo. of Brittany Anthony) at 146:12-147:14.

28          Consequently, Uber does not attempt to track the incidents where someone poses as an

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1  Uber driver and hurts a rider. Peters Decl., Exh. 1 at 186:6-187:14; Peters Decl., Exh. 5 at 184:17-

2  187:14. It cannot reconstruct or begin to estimate the number of such incidents. Peters Decl., Exh.

3  6 at 256-9-259:10; *id.* at 47:11-48:13, 112:22-113:5, 255:21-256:22; Peters Decl., Exh. 9 (Depo.

4  of Akanshu Dhawan) at 173:5-6. It has not performed a root cause analysis of why people end up

5  getting into the wrong car. Peters Decl., Exh. 1 at 144:23-145:1; Peters Decl., Exh. 3 at 84:1-14;

6  Peters Decl., Exh. 9 at 173:24-175:19.

7       **B.**     **Uber Negligently Gave Drivers, Including Known Sexual Predator Sherman,**
           **the Tools to Easily Pose as Uber Drivers and Sexually Assault Riders**

8

9          **1.**     **Uber knew or should have known that riders would view vehicles**
              **bearing its trade dress as affiliated with Uber and therefore**
              **trustworthy**

10

11       CPUC regulation requires that Uber "display consistent trade dress (i.e. distinctive signage

12  or display on the vehicle) when providing TNC services" that "shall be sufficient to **allow a**

13  **passenger, government official, or member of the public to associate a vehicle with a**

14  **particular TNC . . . .**" (RFJN, Exh. B, at p. 31, ¶ h, emphasis added.) The CPUC found that:

15  "Uber **by its name alone** is selling a type of car service." RFJN, Exh. B at pp. 16-17, emphasis

16  added. Uber knew the purpose of the trade dress was to associate a vehicle with Uber. Peters

17  Decl., Exh. 10 (Deposition of Briana Lambert) at 170:17-24; Peters Decl., Exh. 11 at 125:3-13;

18  Peters Decl., Exh. 7 (Deposition of Wade Stormer) at 140:9-16. It was also reflexive for Uber's

19  riders to understand Uber's trade dress in this way, since Uber's transportation service competed

20  with taxis, and Uber leveraged people's existing understanding or mental models of how taxi

21  services worked. Rando Decl. at ¶¶ 41-45.

22       Uber claims customers can trust the company to keep them safe when they get into a

23  stranger's car. Wade Stormer, Uber's Senior Law Enforcement Liaison, agrees that: "**Every time**

24  **someone opens the Uber app, they are putting their trust in Uber to not only get them from**

25  **place to place but to help keep them and their loved ones safe.**" Peters Decl., Exh. 7 at 158:25-

26  159:13; see also Peters Decl., Exh. 4 at 34:19-35:5 ("riders do depend on Uber to provide them

27  with a safe trip"). When Uber sends a driver to a rider's location, it is "vouching for that ride—for

28  that driver, saying: 'We've done a background check, and based on what we know about this

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

5

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1    driver we feel comfortable sending this driver to you. . . ." Peters Decl., Exh. 4 at 35:7-19.

2        Since Uber is imbuing anonymous drivers with trustworthiness, its ability to sell rides

3 depends on its goodwill. Uber's Senior Manager of Business Operations, acknowledged this when

4 he testified before the CPUC: "**Uber works hard to develop [its] goodwill**, which is difficult to

5 reestablish." RFJN, Exh. D (05.18.2022). For that reason, Uber's Global Safety Brand Insights

6 Program conducts surveys regarding the "perception [of] how Uber is committed to safety" Peters

7 Decl., Exh. 12 (Deposition of Abbie Ding Depo) at 48:24-49:10 and seeks to "increase the safety

8 sentiment" *Id*. at 49:24-50:4 & 13:11-14:3. Uber strives to have its riders feel safe when they are

9 using its platform. Peters Decl., Exh. 4 at 33:5-14; *Id*. at 33:12-17. Not surprisingly, people who

10 feel like Uber is committed to safety are more likely to use Uber. Peters Decl, Exh. 12 at 61:9-14.

11 Uber's efforts to make riders feel safe getting into strangers' cars have been successful – so much

12 so that the word "Uber" is now used as a verb and, as of 2017, Uber provided over 41% of all paid

13 car rides in the United States. Bamberger & Lobel, Platform Market Power (2017) 32 Berkeley

14 Tech. L.J. 1051, 1056.

15          **2.**      **Despite the known risks, Uber chose to use inexpensive and easy-to-duplicate logo decals as the way to identify an Uber.**

16

17        Given Uber's knowledge that (1) people were getting into strangers' cars in reliance on

18 drivers' apparent affiliation with Uber, and (2) Uber's trade dress indicated that affiliation, Uber

19 knew or should have known that, if it allowed its trade dress fell into the wrong hands, riders

20 would be at an increased risk for sexual assault.

21        The CPUC allowed Uber to choose its own trade dress so long as it was visible and

22 recognizable. RFJN, Exh. B, at p. 31, ¶ h. The CPUC did not specify the material to be used,

23 whether it should be traceable, or whether there should be other security features to prevent its

24 misuse, or whether other measures should be taken to mitigate the risk of imposter drivers

25 assaulting Uber riders. (*Id*.) Uber chose to use "Uber decals or stickers" that drivers put in their

26 windows. Peters Decl., Exh. 6 at 130:4-7. Presumably, Uber chose a cheap, less secure form of

27 trade dress because it allowed for faster onboarding of drivers, and therefore a competitive

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    advantage.[2]

2         **3.    Before Ms. Doe was attacked, Uber knew that sexual predators with
3              access to its trade dress were exploiting Uber's goodwill to gain access
              to Uber's riders.**

13        In fact, although Uber became aware of numerous incidents of riders getting into vehicles

14   of sexual predators posing as Uber drivers, Uber cannot say how many of these involved an Uber

15   logo decal. Peters Decl., Exh. 6 at 38:14-40:18. This is because Uber, when it investigates these

16   incidents, chooses not to ask these riders whether an Uber logo decal was involved (Peters Decl.,

17   Exh. 6 at 24:7-25:20; 24:11-25:18, 32:5-24, 39:2-9. In many cases, "there may have been an Uber

18   decal displayed, there may not have been," but Uber just cannot tell one way or the other. *Id.* at

19   24:7-17. Thus, Uber's corporate designee on the topic of "the dates and details of all incidents

20   where someone displaying an Uber decal picks up riders and assaults them" had no sense for the

22   [2] In response to interrogatories seeking the identity of those involved in its trade dress decision,
23   Uber responded that it "currently lacks institutional knowledge regarding which individual(s)
     'made the decision (individually or collectively) to distinguish Uber Drivers' vehicles using a
     stick-on Uber Decal.'" Peters Decl., Exh. 24 (Uber's Second Supplemental Response to
24   Interrogatory No. 10). The employee who verified this response had no knowledge about how the
     trade dress was chosen. Peters Decl., Exh. 5 at 86:21-87:24. The jury may reasonably infer, and
25   may even be instructed to presume, that Uber was choosing to put profits over safety, adopting
     cheap trade dress for fast onboarding of drivers, without considering the risk. If Uber attempts to
26   rebut this inference, the jury should be instructed to distrust Uber's evidence given its inability to
     identify a single person actually involved in the decision-making. See Fed. Rules of Evid., Rule
27   302 (state law governs the effect of a presumption regarding a claim or defense for which state law
     supplies the rule of decision); see also California Evid. Code sec. 412 (if a party offers weaker
28   evidence when it was within the party's power to produce stronger evidence, the evidence offered
     should be viewed with distrust).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

magnitude of the problem and could not identify any effort by Uber to track the number of such incidents. *Id*. at 122:17-123:23. Moreover, Uber's corporate designee was not even familiar with the numerous prior similar incidents that Plaintiff's counsel located in Uber's own records. *See, e.g., Id*. at 194:19-198:7,

**4.      Uber knew its former driver Brandon Sherman was a sexual predator but, despite the foreseeable risk, let him keep its trade dress.**

On April 21, 2017, Mr. Sherman became an authorized Uber driver. Peters Decl., Exh. 6 at 25:15-27:11, Exh. 4 to Baker Depo, Vol. III. Uber provided him with decals to identify his vehicle as an Uber. Peters Decl., Exh. 7 at 140:9-16; Exh. 23 (letter to Sherman confirming decals).)

On January 5, 2018, less than six months after Sherman performed his first ride on the platform, Uber received a message from one of his riders reporting that he had kidnapped and sexually assaulted her.

Uber put a hold on Sherman's account but reactivated him the next day, and again allowed him to pick up Uber customers. Peters Decl., Exh. 4 at 84:17-85:2; Exh. 10 at 116:22-117:3, Exh.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1   6 to Lambert Depo. On June 9, 2018, another foreign-born Uber rider reported that Sherman had

2   kidnapped and sexually assaulted her. Peters Decl., Exh. 13 (Depo. of Billie Garrett) at 209:14-

3   211:15, 218:2-12, Exhs. 7 & 8 to Garrett Depo.

13   Uber had an obligation to retain control of company identification which would enable an

14   employee terminated for allegations of sexual assault access to situationally vulnerable

15   individuals. Jeglic Decl. at 16. However, Uber made no effort to retrieve its decals from Mr.

16   Sherman.[3] Peters Decl., Exh. 13 at 218:21-220:7 [this practice has since changed]; Peters Decl.,

17   Exh. 13, Exh. 9 to Garrett Depo. [showing no language directing Sherman to return or destroy the

18   decals]; Peters Decl., Exh. 14 (Deposition of Lilli Flores) at 73:24-75:9.

19   **C.    Uber Enabled and Emboldened Sherman to Continue Preying on Its Riders by
       Dealing Lightly with His Assaults, and Shielding Him from Criminal
20     Consequences**

21        **1.    Uber dealt lightly with Sherman's first sexual assault and kidnapping,
             describing it as "flirtation" and encouraging him to continue driving.**

23   The report Uber received on January 5, 2018 described kidnapping and sexual assault, and

---

25   [3] Uber claims that its "**Transportation** Services Agreement" with Sherman demonstrates that it

26   "'terminate[d] [its] consent to [the decals'] use' when it deactivated him from the platform." (Mtn.
     at 16:18-26.) Not so. The contract, actually titled **Technology** Services Agreement, states that the
     driver "shall not . . . access or use the Uber Services or Driver App to… attempt to gain

27   unauthorized access to the Uber Services or its related systems or networks." (Baker Decl., Exh. A
     at ¶ 5.2.) Uber Services and Driver App are not defined to include trade dress. (*Id.* at ¶¶ 1.6 and

28   1.13.) Paragraph 5.3 merely says that the driver shall not use the logos and trade dress "for any
     **commercial** purpose" except as permitted by Uber. (*Id.* at ¶ 5.3.)

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

9

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

(potentially) attempted rape. Declaration of Sumerle Pfeffer Davis, ("Pfeffer Decl.") at ¶ 5 Pfeffer Decl. at 9-14. In allowing him to keep driving, the SIU was following Uber's policy that a credible report of sexual assault would only result in permanent deactivation if it were "conclusive" or the second such report. Peters Decl., Exh. 10 at at 139:2-141:14, 145:19-146:24. Uber deems an incident conclusive only if there was (1) an admission of guilt, (2) photo or video evidence of the assault or associated injury, or (3) police report or court findings that the driver was guilty. *Id*. at 139:2-141:14. Practically, this meant almost no initial allegations of sexual assault were considered conclusive while this policy was in effect. *Id*. at 141:15-144:22.

In reactivating Sherman, SIU sent him a email that grotesquely mischaracterized the gravity of the allegations, saying: "Your rider claims that some of your actions **may have come off as flirtatious**, or as advances towards them. . . . **We appreciate and value you as an Uber partner**… [Y]our account is now active and you will be able to accept trip requests effective of this email, Brandon." *Id*. at 124:3-11, 155:7-23, Exh. 6 to Lambert Depo. at pp. 1-2 (emphasis added). Uber did not tell Sherman that he had been accused of sexual assault. Peters Decl., Exh. 4 at 110:2-5. By calling a credible allegation of kidnapping and sexual assault "flirtatious" Uber conveyed to Sherman that his misconduct was innocent and merely misinterpreted. By allowing him to keep driving without consequence, Uber sent Sherman the message that he would escape consequences. Jeglic Decl. at ¶¶ 12-15. When sexual violence perpetrators offend without consequences, this is a risk factor that increases the probability of re-offense. *Id*.

> **2.  Uber shielded Mr. Sherman from legal consequences for his prior sexual assaults by making it difficult and confusing for potential victims to report to law enforcement.**

The goals of riders who report sexual assault and rape to Uber are usually to protect other women in the future. Decl. of Lynn E. Ponton, M.D. ("Ponton Decl.") at ¶ 6-8. But Uber's investigators who received such reports were there to protect the company's reputation over the riders' interests in preventing future harm. Peters Decl., Exh. 14 at 33:16-34:8. Uber strictly prohibits SIU investigators from ever contacting law enforcement about completed crimes, no matter how credible and serious. Peters Decl., Exh. 14 at 35:21-36:2, 38:12-20; Peters Decl., Exh. 10 at 33:14-34:6. And Uber does not tell the reporting party: "We're not going to be report this to

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1    the police. If you want to do that, that something you need to do." Peters Decl., Exh. 13 at 198:4-

2    15. In fact, Uber does not even give the reporting party information about **how** to contact law

3    enforcement. Peters Decl., Exh. 14 at 46:23-47:7; 48:11-25.

4         In its conversation with the non-English-speaking woman who reported the January 5,

5    2018 assault (the "Reporting Party" or "RP"), the SIU investigator, following an Uber script,

6    conveyed to her that there would be serious consequences to Sherman, saying "under no

7    circumstances is that type of behavior acceptable or tolerated on the Uber app." Peters Decl. Exh.

8    27 (Transcript of Call) at 3:23-25. The RP asked for guidance about going to law enforcement

9    saying that she was unsure what to do since she is only a student. *Id*. at 4:18-5:12. She expressed

10   interest in making a criminal report, saying "please give me the info for the law enforcement." *Id*.

11   at 5:13-23. Uber's SIU agent said: "Will do." *Id*. at 5:24. Uber's email, in English, was

12   misleading. It made it sound as though Uber was taking immediate and decisive action, saying

13   "we have initiated an internal investigation," reports like these are taken "very seriously," and

14   drivers "have been deactivated for reports of much less." Peters Decl., Exh. 10, Exh. 5 at p. 2. The

15   email made it sound as though Uber was already working with law enforcement, saying "we have

16   a Law Enforcement Response Team that works with local authorities" and "we will cooperate with

17   law enforcement's investigation through the necessary channels." *Id*. Nowhere did the email

18   clarify that these actions would not happen **unless the RP first made a report to law**

19   **enforcement.** *Id*.

20        Uber had an obligation to minimize barriers for reporting sexual violence for clients who

21   experience sexual assault. Jeglic Decl. at ¶ 15. But instead, it misled the RP. Had Uber given the

22   RP clear information or offered to help her make the report to law enforcement, she likely would

23   have reported the incident to police. Ponton Decl. at ¶¶ 5-10. This likely would have resulted in a

24   criminal investigation and criminal prosecution of Mr. Sherman. Pfeffer Decl. at ¶¶ 9-23.

25        **3.    Uber took no action to protect its riders from the foreseeable risk that
            Mr. Sherman would exploit its platform to assault more women.**

26

27        Uber knows that people who have committed sexual assault may go on to reoffend. (Baker

28   Vol. I at 143:14-19.) However, after the January 5, 2018 incident, **Uber admits it did nothing**

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

11

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1  **whatsoever to protect its riders against assaults by Mr. Sherman**. (Baker Vol. I at 130:4-11.)

2  Its communications to Sherman were not designed to protect riders or prevent future incidents.

3  (Baker Vol. I at 95:8-16 & 116:21-117:6.)

      **D.**      **Uber Negligently Increased the Risk of Sexual Assault Even Further by**
4             **Allowing Ride Requests on Behalf of Inexperienced Guest Riders with No**
5             **Working Phones.**

           **1.**     **Uber does not tell its riders that it is dangerous to rely on its trade dress**
6                  **to identify safe rides, nor does it give them clear and consistent**
7                  **directions on what they should use instead of the trade dress.**

8        As shown above, an Uber rider may reasonably believe she is safe so long as she gets into

9  a vehicle bearing Uber trade dress, which indicates affiliation with Uber's brand and therefore

10  trustworthiness. She may reasonably assume that any additional tools Uber provides are to help a

11  rider, for convenience' sake, distinguish her Uber from another rider's equally safe Uber. See

12  discussion, *supra*; see also Rando Decl. at ¶ 45.

13        Uber, on the other hand, knows about its practice not to control the distribution of its trade

14  dress. Peters Decl., Exh. 7 at 218:22-219:9 (not aware of any steps Uber takes to prevent

15  unauthorized users from putting Uber's trade dress on their vehicles.) Uber knows that rider

16  **safety**, not mere convenience, depends on riders getting into the right car. Peters Decl., Exh. 7 at

17  43:24-44:3, Exh. 2 to Stormer Depo. Uber knows that some (unidentified) percentage of people

18  utilized the presence of a decal to identify their ride. Peters Decl., Exh. 3 at 124:16-24. This is

19  even though, before August 2018, **Uber did not "do anything to try to find out if Uber riders**

20  **were sometimes getting into cars simply because they had a logo decal**." Peters Decl., Exh. 9

21  at 139:25-140:3; see also 60:22-25, 63:2-17, 139:25-142:13, 142:14-18, and 142:14-144:9. Uber

22  knows that it must provide reliable tools, and make sure its riders are using them to "get into the

23  right car." Peters Decl., Exh. 7 at 66:21-67:17; see Donndelinger Decl. at ¶¶ 39-50; Rando Decl. at

24  ¶¶ 10-31.

25        There were numerous ways Uber could have designed its platform to match riders and

26  drivers. Donndelinger Decl. at ¶¶ 14-51; Rando Decl. at ¶¶ 10-33; Peters Decl. Exh 20 (Rando

27  Depo.) at 202:8-205:18. Incredibly, rather than study what were the best tools to reliably deliver

28  its riders into the right car, Uber designed its system by asking a handful of riders what tools they

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

12

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1  "want." Peters Decl., Exh. 9 at 194:21-196:25.

2      Uber cannot argue that riders like Ms. Doe should have known to rely on in-App tools

3  rather than its trade dress to identify safe rides. Even Uber's Global Director of Project

4  Management does not know exactly what information riders **should** check in order to safely get

5  into a car using the Uber app. Peters Decl., Exh. 9 at 206:12-20. Uber certainly does not know

6  what riders **do** use to identify their rides, but it thinks that at least some users probably use "some"

7  or a combination of information from the app. Peters Decl., Exh. 9 at 201:7-10. Prior to August

8  2018, Uber never conducted a single study devoted to finding out what riders were relying on to

9  identify their ride. Peters Decl., Exh. 9 at 117:20-23; 126:21-15 (no simulation testing); 128:16-

10  130:3 (no field testing.) It did not analyze why Uber riders were ending up in imposter Uber

11  vehicles. Peters Decl., Exh. 6 at 125:16-126:2.

12      Not surprisingly, Uber's approach resulted in a steady stream of Uber riders getting into

13  the wrong car. In a market survey of riders, 35 percent said they sometimes, often, or almost

14  always had difficulty finding the car/driver. Peters Decl., Exh. 12 at 70:17-71:3. Slide 27 of

15  Exhibit 3 to the Deposition of Abbie Ding shows that rider awareness of the safety features of the

16  app was low. *Id*. at 69:23-70:14. In 2016, Uber estimated that every week, at two New York

17  airports alone, 2,300 of its riders getting into the cars of people posing as Uber drivers. RFJN,

18  Exh. C (Uber letter to Port Authority). An Uber presentation titled the "Wrong Uber Project"

19  reflects that, excluding safety-related incidents, Uber had 2.3 known million Wrong Driver

20  incidents in 2018. Peters Decl., Exh. 6 at 41:14-43:11, Exh. 2 to Baker Depo. at p. 59; see Peters

21  Decl., Exh. 9 at 185:15-186:4; Peters Exh., Decl. 6 at 45:15-46:25. These "wrong Uber" incidents

22  may be limited to incidents where an actual Uber rider gets into an actual Uber car, but it's just the

23  wrong car (Peters Decl., Exh. 9 at 178:19-180:16, Exh. 7 to Dhawan Depo) leading to "costly

24  support tickets for Uber." Peters Decl., Exh. 9 at 185:15-186:4.

25      Uber asserts that Jane Doe was "aware that a license plate is one way for riders to verify

26  they are getting into the vehicle they are matched with in the Uber App." Uber Mtn. 3:25-27.

27  Knowing that certain tools are available as an option is not the same as knowing that they are

28  necessary for a safety purpose. **Uber never even told riders that they should not rely on the**

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

13

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1   **presence of an Uber decal to indicate that a driver is an Uber Driver**. Peters Decl., Exh. 23

2   (2021-06-30 RFPD1 Uber Supplemental Resp. No. 57) [none of the documents Uber identifies is

3   responsive]. **Uber cannot identify any time that it warned riders that getting into the wrong**

4   **car could put them at risk for sexual assault**. Peters Decl., Exh. 2 at 247:2-250:8.

     **2.**      **Uber further increases the risk of sexual assault by allowing App users**
            **to call for a ride on behalf of a third-party guest at a remote location**
            **even if the guest is inexperienced with Uber or does not have a working**
            **phone.**

8        Making matters worse, Uber explicitly allows app users to request rides on behalf of guests

9   who do not have access to cell phones. Peters Decl., Exh. 7 at 104:3-105:24. Uber's does not try to

10  ensure these riders possess operational phones. Peters Decl., Exh. 15 at 51:16-22. It advertises this

11  service as appropriate if "grandma" does not have a "smartphone." Peters Decl. Exh 21 (Koestner

12  Depo), & Exh. 6 to Koestner. Uber's retained expert tried and failed to explain how someone

13  without a working smartphone could receive a text with tools to identify a ride. Exh. 21 at 92:8-

14  93:24.

15       The top reasons why Uber users request rides for guests include (1) the guest's phone

16  battery died (Peters Decl., Exh. 15 at 281:21-24), and (2) the guest's "lack of familiarity with the

17  app." *Id.* at 282:9-15, 290:2-17; Peters Decl., Exh. 15 at 290:19-291:1. Not having access to a

18  working cell phone during guest rides was a highly foreseeable user circumstance that Uber had an

19  obligation to anticipate. Donndelinger Decl. at ¶¶ 32-33. Uber could have prohibited or placed

20  restrictions on these types of guest rides. Donndelinger Decl. at ¶¶ 31-38; Rando Decl. at ¶¶ 31-37.

21  By allowing this type of ride, Uber increased the chances that these guest riders (who had no

22  working cell phones and therefore no access to any identifying information about the driver)

23  would get into the car of someone posing as an Uber driver. Donndelinger Decl. at ¶¶ 31-38.

24  Indeed, when Uber gathered data regarding guest rides in Latin America, it found that these rides

25  were associated with an increased risk of sexual assault. Id. at 259:24-260:11.

26       **E.**     **Uber's negligence was a substantial factor in causing harm to Plaintiff Jane**
          **Doe.**

28       When Ms. Doe was assaulted by Sherman on August 18, 2018, it was only eight months

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

14

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

since Sherman's January 5, 2018 sexual assault on Uber's platform. If Uber had helped that prior victim to report to law enforcement, there is a probability that Sherman would have still been subject to pending criminal charges for sexual battery in August. Pfeffer Decl. at ¶¶ 9-23. Instead, given that he had successfully exploited Uber's platform to kidnap and assault two women, with no resulting criminal investigation and only gentle reprimands about "flirtation," he was probably feeling emboldened. Jeglic Decl. at ¶¶ 13. This likely was a substantial factor in his decision to re-offend on January 5, 2018. Jeglic Decl. at ¶¶ 5-7, 13, 18. Additionally, Sherman still had Uber's trade dress on his vehicle, and as an experienced Uber driver, he knew how to use the trade dress as a tool to lure Ms. Doe into his car. That is exactly what happened.

Before the incident, Ms. Doe had seen Uber marketing about the safety of its rides, and believed it was a company that "trustable," easy to use, and friendly. Peters Decl., Exh. 16 (Deposition of Jane Doe, Vol. I) at 18:13-20. She had only used Uber a handful of times,[4] and understood Ubers to be a type of "taxi car." Peters Decl., Exh. 17 (Deposition of Jane Doe, Vol. II) at 173:17-24; Peters Decl., Exh. 16 at 18:21-22; 24:18-22. When Ms. Doe (who is from Mexico, where Ubers do not use any trade dress) arrived in San Francisco a few [SP1] [KSC2] days before the incident for a vacation with her boyfriend, she saw Uber decals for the first time and thought they were very useful for identifying Ubers. Peters Decl., Exh. 17 at 173:17-24.

After shopping by herself for the day, Ms. Doe asked her boyfriend to call her an Uber because her battery was dying. Peters Decl., Exh. 18 (Depo. of Arias at 77:4-8). He did so and, by the time the vehicle arrived, her battery was dead. Peters Decl., Exh. 16 at 66:19-67:12. One reason Jane Doe believed Sherman was her Uber driver is because he had Uber's decal sticker. *Id.* at 64:3-8, 110:13-111:1; Peters Decl., Exh. 17 at 176:18-177:11.[5] As discussed above, Ms. Doe's

---

[4] In Mexico, her home country, Ms. Doe had only used Uber once where she called for the ride herself (Peters Decl., Exh. 16 at 26:9-11), and only 3-5 times where someone else called for a ride for her (*Id.* at 20:1-6), and of those times she rode with others at least two times (*Id.* at 20:9-22:24). She thought the method for identifying her Uber ride was that it showed up to her location. *Id.* at 118:7-10.

[5] He also came to her location. Peters Decl., Exh. 16 at 53:15-18; Peters Decl., Exh. 17 at 176:18-177:11. When she approached the car, there was additional confirmation. He seemed to have an Uber app open, seemed to be acting like an Uber driver, and seemed to say her boyfriend's name. Peters Decl., Exh. 16 at 63:20-64:22; 64:3-10.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1  belief that she could rely on the decal was entirely reasonable and foreseeable, especially in the

2  context of a guest ride. In other words, the fact that Uber had allowed Mr. Sherman to keep its

3  trade dress was a substantial factor in causing Ms. Doe to get into his vehicle. It is undisputed that

4  Ms. Doe went on to suffer grave harm. She was kidnapped, raped, and strangled.

5  **III.     ARGUMENT**

6      **A.     Applicable Standard**

7      "In ruling on a motion for summary judgment, [t]he evidence of the nonmovant is to be

8  believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S.

9  650, 651 (2014) (quotation marks and citation omitted). *Hahn v. Select Portfolio Servicing, Inc.*,

10  424 F.Supp.3d 614, 624 (N.D. Cal. 2020). "[A]lthough the court should review the record as a

11  whole, it must disregard all evidence favorable to the moving party that the jury is not required to

12  believe." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150-51 (2000).

13      "When interpreting state law, federal courts are bound by decisions of the state's highest

14  court." *P.S.M. Holding Corp. v. Nat'l Farm Fin. Corp.*, 884 F.3d 812, 820 (9th Cir. 2018)

15  (quotations marks and citation omitted). Only "**[i]n the absence of such a decision**" must a

16  "federal court [ ] predict how the highest state court would decide the issue using intermediate

17  appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as

18  guidance." *Id.* (internal quotation marks and citation omitted) (emphasis added). The Ninth Circuit

19  recognizes: "Decisions of the six district appellate courts are persuasive but do not bind each other

20  or us, although we generally will follow a published intermediate state court decision regarding

21  California law unless we are convinced that the California Supreme Court would reject it."

22  *Tompkins v. 23andMe, Inc.*, 834 F.3d 1019, 1025 (9th Cir. 2016) (quotation marks and citation

23  omitted) (emphasis added); *see also In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).

24      **B.     Summary Judgment Should Be Denied Because There Is a Genuine Dispute of
Material Fact as to Whether Uber Delivered Its Service in a Manner that
25      Foreseeably and Unreasonably Increased the Risk of Assault.**

26          **1.     Under California law, Uber owes its riders a duty not to deliver its
services in a manner that foreseeably and unreasonably increases the
27          risk of assault.**

28              **(a)     Binding California Supreme Court authority supports finding a**

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

16

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

**duty.**

There is long-standing authority from California's highest court that is binding here. *See P.S.M. Holding Corp.*, *supra*, 884 F.3d at 820. Just last year, the California Supreme Court reiterated the general, well-established rule that the duty of care includes a duty to protect or warn when one's actions create or increase a risk that others will be injured, whether directly or by third parties. *Brown v. USA Taekwondo*, 11 Cal.5th 204, 214 n.5 (2021) [hereafter *Brown*]. Civil Code section 1714 codifies the common law "default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" *Brown*, 11 Cal.5th at 214 (citation omitted). This "general duty of care" is imposed "on a defendant only when it is the defendant who has 'created a risk' of harm to the plaintiff, including when 'the defendant is responsible for making the plaintiff's position worse.'" *Id*. (citations omitted). "[T]he relevant legal question is whether the defendant has engaged in activities that created or increased the plaintiff's risk of harm." *Id*. at 214 n.5. The converse is also true: a "'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." *Brown*, 11 Cal.5th at 214 (citation omitted). But that "no-duty-to-protect rule will not relieve the defendant of an otherwise applicable duty to exercise reasonable care when, by its own conduct, the defendant has increased the risk of harm to the plaintiff." *Id*. at 215 n.7.

The California Supreme Court warned in *Brown* that the traditional verbiage used to distinguish increasing a risk ("misfeasance") and just being a bystander who does not help ("nonfeasance") "is imprecise and prone to misinterpretation. 'The proper question is not whether an actor's failure to exercise reasonable care entails the commission or omission of a specific act.' Restatement (Third) of Torts § 37 & *cmt. c* (Am. Law Inst. 1975). Rather, it is 'whether the actor's entire conduct created a risk of harm.'" *Id*. As Justice Cuéllar put it in his concurrence, "[t]he person who sets the stage owes the players a general duty to exercise reasonable care. . . . The organizer, by bringing people together, may 'creat[e] the risk' even if less directly than a criminal or intentional tortfeasor." *Id.* at 226–227 (2021) (Cuéllar, J., concurring).

The Supreme Court expressed these same principles in *Weirum v. RKO General, Inc.*, 15 Cal.3d 40 (1975) (radio station liable when participants in radio contest's sponsored road race

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1   predictably drove negligently and caused a collision resulting in injuries), distinguishing between

2   a defendant's liability for "creation of an unreasonable risk of harm" as opposed to its lack of

3   liability for a failure to beneficially intervene. *Id.* at 49. It dismissed fears that its holding would

4   lead to "unwarranted extensions of liability" since, it said, the defendant's risk creation was not

5   merely the ordinary and unavoidable risk inherent to commonplace commercial activities. *Id.* at

6   48. "It is true, of course, that virtually every act involves some conceivable danger. Liability is

7   imposed only if the risk of harm resulting from the act is deemed unreasonable—i.e., if the gravity

8   and likelihood of the danger outweigh the utility of the conduct involved." *Id.* at 47-48 (citations

9   omitted).

10          Since *Weirum*, the California Supreme Court has twice discussed the duty not to expose

11   someone to an unreasonable risk of injury at the hands of third parties, once in *Brown*, discussed

12   *supra*, and once in *Lugtu v. California Highway Patrol*, 26 Cal.4th 703 (2001). In *Lugtu*, the Court

13   held that a highway patrol officer had a duty to protect the Lugtus because he caused them to stop

14   their car on the center median strip of the highway and they were then struck by an oncoming

15   truck. *Id.* at 707.  The Court recognized that the "basic tort principle recognizing that the general

16   duty of due care includes a duty not to expose others to an unreasonable risk of injury at the hands

17   of third parties" applied. *Id.* at 717. *Lugtu* is not based on any special duty imposed on police

18   officers. Indeed, police officers have no greater duty of care than any ordinary person. *Williams v.*

19   *State of California*, 34 Cal.3d 18, 24 n. 3 (1983). Instead, it is expressly based on the "general duty

20   of due care. . . ." *Id.* at 716–717. Obviously, Officer Hedgecock did not encourage the oncoming

21   truck driver to strike the Lugtus' car, nor was the truck driver's negligence a necessary component

22   of Officer Hedgecock's conduct. But he had a duty of care because his own conduct caused the

23   Lugtus to be in a more dangerous situation than they otherwise would have been in.

24          Indeed, this has long been the common law rule. *See, e.g., Richardson v. Ham,* 44 Cal.2d

25   772, 777 (1955). In *Richardson*, members of a construction partnership who were engaged in earth

26   moving operations were held liable for leaving their bulldozer unlocked and accessible for a third

27   party's misuse. *Id.* at 774. The plaintiffs brought action against the bulldozer's owners and

28   operators for negligently failing to lock it before it was obtained by assailants who drove the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1    bulldozer into the plaintiffs' property and caused injury. *Id*. at 774-775. Given the foreseeable risk

2    of intermeddling by third party assailants and the accessibility of the bulldozer, there was a high

3    risk of injury posed the defendant's failure to control and authorize the operation of the machine.

4    *Id*. at 777. In *Richardson*, the defendants did not encourage drunken young men to joyride on

5    defendants' bulldozer and leave it on top of a hill where it would roll down, uncontrolled, through

6    traffic and a house. *Id*. 44 Cal.2d at 774–775. Defendants' conduct—leaving the bulldozer

7    unsecured—merely caused or increased the risk of danger. *Id*. at 777. Defendants were liable, not

8    because the young men's conduct was a necessary component of the Defendants' construction

9    activity, but because the "extreme danger created by a bulldozer in uncontrolled motion and the

10   foreseeable risk of intermeddling fully justify imposing a duty on the owner to exercise reasonable

11   care to protect third parties from injuries arising from its operation by intermeddlers." *Id*. at 776.

12          And in *McEvoy v. American Pool Corp*., 32 Cal.2d 295 (1948), defendants were liable for

13   failing to warn about the "inherently dangerous nature of the chemicals" they provided their

14   employees to transport, and took no steps to protect third parties who might be injured if the glass

15   containers with those chemicals broke. *Id*. at 297–298. There was no suggestion the defendants

16   encouraged their employee to expose his mother to chlorine gas and hydrochloric acid. *Id.*

17                    **(b)**      **The recent California appellate decision is a non-binding outlier.**

18          The second district court of appeal in *Uber Techs., Inc.* imposed two significant limitations

19   nowhere mentioned in California's Supreme Court precedent: that the defendant urged the third

20   party to commit misconduct and that the third-party crime was a "necessary component" of

21   defendant's conduct. *Jane Doe No. 1 v. Uber Techs, Inc.*, 79 Cal. App. 5th 410, 425, 427-28

22   (2022) [hereafter "*Uber Techs.*"] (holding a duty only arises "where the defendant actively urges

23   the third party to act in the inherently dangerous manner that injured the plaintiff.") These

24   limitations are not consistent with the common law rule, prior case law, Supreme Court authority,

25   or common sense. If these limitations were adopted on a large scale, companies like Uber would

26   effectively be immune from responsibility for negligently exposing customers to third party

27   criminal conduct in order to maximize profits, since it is hard to imagine a scenario where third

28   party criminal conduct is a "necessary component" of corporate conduct or "urged" by corporate

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

19

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1   actors.

2   The court of appeal in *Uber Techs.* improperly drew the "necessary component" limitation

3   from a factual distinction between two prior appellate cases, *Weirum, supra,* and *Sakiyama v. AMF*

4   *Bowling Centers, Inc.* 110 Cal.App.4th 398 (2003), ignoring that those cases do not present the

5   only possible manner of placing people at risk. The *Uber Techs.* court read the court's opinion in

6   *Weirum* as requiring that "the plaintiff was injured by third parties doing exactly what the

7   defendant's conduct encouraged them to do. . . ." *Uber Techs., Inc.*, 79 Cal.App.5th at 425. The

8   court opined that "encouragement" of the third party is "a defining feature of *Weirum*

9   misfeasance." *Uber Techs., Inc.*, 79 Cal.App.5th at 425; *see Sakiyama,* 110 Cal.App.4th at 409.

10  That is a valid factual distinction between *Weirum* and *Sakiyama,* but it does not define the legal

11  test for a duty of care.

12  The Court of Appeal also cited *Melton v. Boustred,* 183 Cal.App.4th 521 (2010) where the

13  court found that hosting an open party advertised on MySpace did not make a homeowner liable

14  for an assault at the party. The basis for the holding in Melton was the lack of active conduct

15  increasing the risk of harm: "[W]e conclude defendant did not engage in any active conduct that

16  increased the risk of harm to plaintiffs." *Id.* at 533. *Melton* observed that the "necessary

17  component" language was the "crux of the difference between" the facts in those cases and

18  *Weirum*, but unlike *Uber Techs.*, Melton did not adopt "necessary component" as a legal test

19  distinguishing between misfeasance (creating a duty) and nonfeasance (creating no duty).

20  The genuine distinction between *Melton* and *Sakiyama* versus *Weirum* is that the former

21  cases involve only the ubiquitous risk inherent in commonplace business activities (such as the

22  operation of a bar, restaurant, or similar establishment).

23              **2.      There Is a Genuine Issue of Disputed Fact as to Whether Uber**
                          **Foreseeably and Unreasonably Increased the Risk of Sexual Assault.**
24

25  Applying the standard articulated by California's highest court and set forth in the

26  Restatement, Uber has a duty not to unreasonably increase the risk of injury to others, and also to

27  protect others against those risks it negligently causes. *See Brown, supra,* 11 Cal.5th 204; *Lugtu,*

28  *supra*, 26 Cal.4th 703; *Weirum, supra*, 15 Cal.3d 40; *Richardson, supra*, 44 Cal.2d 772; and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

*McEvoy*, *supra*, 32 Cal.2d 295; *see also* Restatement (Third) of Torts § 37 & cmt. c (Am. Law Inst. 1975). It does not matter that abduction and rape are not "necessary component[s] of the Uber business model." *Id*. at 427. What matters, under California law, is that Uber negligently created a risk that its riders would be injured by criminals posing as Uber drivers, and that this was more than the ordinary risk of harm inherent in commonplace business activities. *See Weirum*, 15 Cal.3d at 47-49.

Uber's negligent risk creation includes, as discussed above, supplying its trade dress to Mr. Sherman and thereby indicating to the public that he was a trustworthy driver affiliated with Uber, but then, after learning that Sherman was a sexual predator exploiting the platform to prey on its riders, taking no steps to retrieve its trade dress from him even though it knew riders relied on the trade dress and might be sexually assaulted as a result. (Section II.B, *supra*.) It also includes, after learning of the January 5, 2018 sexual assault, shielding Mr. Sherman from criminal investigation and prosecution, emboldening him by shrugging off his first kidnapping and assault as potential "flirtation," praising him as a valued partner, and allowing him to keep driving for Uber for a time. (Section II.C, *supra*.) Finally, Uber's negligence includes ignoring the data that show its riders were being assaulted due to their trust in drivers apparently affiliated with Uber, and therefore failing to give its riders, including Ms. Doe, direction and tools to reliably deliver them into safe Ubers as opposed to the vehicles of people posing as Uber drivers; and also its negligence includes allowing rides to be requested for guests like Ms. Doe who do not have a working cell phone, and are therefore almost forced to rely on the Uber decal as the means to identify their ride. (Section II.D, *supra*.)[6]

---

[6] Even if *Uber Techs*.' opinion were otherwise binding, Uber is incorrect that this Court would be "obligated to follow" its holding addressing "Plaintiff's negligence claim against Uber" in the instant case. (See Uber Mtn. 12:14-15.) California appellate courts review denial of a motion for leave to amend for abuse of discretion. *Royalty Carpet Mills, Inc. v. City of Irvine*, 125 Cal.App.4th 1110, 1124 (2005). When amendment would be futile, the trial court does not abuse its discretion in denying leave to amend. *Id.* In *Uber Techs*., the fact pattern before the trial court did not appear to involve former Uber drivers, nor drivers whom Uber had directly provided with its trade dress, nor guest ride requests, and thus the same allegations that might be futile in one case because they only supply context, might give rise to a distinct theory in another case.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

**C.      Summary Judgment Should Also Be Denied Because Uber Undertook Services That It Should Have Recognized Were Necessary for the Protection of Its Riders**

In addition to its duty not to act in a way that puts other people at risk, Uber has a duty, when it undertakes to act for the benefit of a third party, to do so reasonably:

> [O]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care in his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965); *see also Paz v. State of California*, 22 Cal.4th 550 (2000) (setting out elements of claim). Accordingly, a rail operator who has contracted to provide checkpoint procedure may be liable to third party beneficiary if "an imposter posing as [ ] driver" stole the shipment from the yard. *See Intercargo Ins. Co. v. Burlington Northern Santa Fe RR*, 185 F.Supp.2d 1103, 1113 (C.D. Cal. 2001) (applying California law). And a restaurant employee may be liable for failing to follow through on his agreement to withhold a patron's car keys if the patron was not fit to drive his vehicle after leaving the restaurant. *Williams v. Saga Enterprises, Inc.*, 225 Cal.App.3d 142 (1990).

Here, Uber undertakes to "match riders who need a ride with drivers who are online and available to provide a ride." (RFJN Exh. B at pp. 2 & pp. 68; Decl. of Peters Exh. 4 at 29:10-16.) If it fails to do so reasonably, as set forth above, it should be liable.

**D.      Summary Judgment Should Also Be Denied Because Uber Owed, and Violated, a Duty to Protect Jane Doe Based on a Special Relationship Characterized by Her Dependence on Uber's Ride-Matching Service**

A separate ground for denying Uber's motion is that Uber is in a special relationship with Plaintiff Jane Doe that gives rise to a duty to protect her. Classic examples of special relationships include those between store proprietors and customers, innkeepers and invitees, and common carriers and their passengers. *See Regents of University of California v. Superior Court*, 4 Cal.5th 607, 620 (2018) citing Restatement (Third) of Torts § 40b (1975). Technology has given rise to new forms of business relationships where interactions are hosted on invisible "platforms" rather

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

22

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1    than physical properties. But special relationships are not defined by an exhaustive list, but by

2    unifying principles. Under those principles, there is equal basis for a duty to be recognized

3    between Uber and its riders as there is between a store proprietor and its customers.

4            The set of special relationships that gives rise to a duty is not set in stone but evolving.

5    "The Restatement authors observed over 50 years ago that the law has been "working slowly

6    toward a recognition of the duty to aid or protect in any relation of dependence or of mutual

7    dependence." *Regents*, *supra*, 4 Cal.5th at 620-621 citing Restatement (Second) of Torts § 314A

8    & *cmt. b* (1965). In California, the defining characteristics of a special relationship are (1) "an

9    aspect of dependency in which one party relies to some degree on the other for protection" and the

10   "other has superior control over the means of protection" or "some control over the plaintiff's

11   welfare" (*Regents*, *supra*, at 620-21), (2) usually "defined boundaries" that "create a duty of care

12   owed to a limited community not the public at large" (*Brown*, *supra*, 40 Cal.App.5th at 1092),

13   and, usually, "benefit" to the party charged with the duty of care (i.e., the benefit to a retail store or

14   hotel by receiving visits from customers and guests) (*id.* at 607, 621).

15           In 2018, the California Supreme Court in the *Regents* case found that a college-student

16   relationship (with adult students) fits within the paradigm of a special relationship during

17   curricular activities, since students "are comparatively vulnerable and dependent on their colleges

18   for a safe environment" and colleges "have a superior ability to provide that safety with respect to

19   activities they sponsor or facilities they control." *Id.* at 607, 625 (finding that UCLA may have

20   been negligent in failing to prevent attack by fellow student with known propensities); *see also*

21   *Dix v. Live Nation Entertainment, Inc.*, 56 Cal.App.5th 590, 608 (2020) (a special relationship was

22   found between an electronic music festival and its invitees because "attendees were dependent on

23   Live Nation," the festival operator for security and medical services).

24           Here, just as a store proprietor or restaurant has more control than its customers over

25   making the environment safe, Uber has more control than its riders in making the environment

26   safe on its "platform." Uber riders depend on Uber to conduct background checks, select safe

27   drivers, identify its affiliated drivers using trade dress, and provide other safeguards to ensure

28   riders do not inadvertently get into criminals' cars. (See Sections A.1 & B.1, *supra,* and Peters

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

23

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

Decl., Exh. 4 at 35:7-19.) As Uber's Senior Law Enforcement Liaison agreed: "Every time someone opens the Uber app, they are putting their trust in Uber to not only get them from place to place but to help keep them and their loved ones safe." Peters Decl., Exh. 7 at 158:25-159:13; *see also* Peters Decl., Exh. 4 at 34:19-35:5 ("riders do depend on Uber to provide them with a safe trip"). There is also a large information disparity between Uber and its riders regarding the on-platform risks, and a disparity in their ability to study and address those risks. (Section D.1, *supra*.) At the time she was attacked, Ms. Doe was an Uber rider who was a guest or invitee on its platform. As such, she was in a special relationship that required Uber to use reasonable care in protecting her against foreseeable risks of harm.

### E.   The Rowland Factors Do Not Support Limiting Uber's Duty

The *Rowland* factors do not remotely support limiting the duties Uber otherwise owes to plaintiff here. These "factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability." *See Doe v. Roman Catholic Archbishop of Los Angeles,* 70 Cal.App.5th 657, 673–674 (2021) (citations omitted). "The most important factor to consider . . . is whether the injury in question was foreseeable." *Id.* Foreseeability is the "most important factor to consider" and is about "generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed.'" *Id.* at 675-676 (citations omitted). Even rare events may be foreseeable. *Regents*, *supra*, at 629. Here, given the nature of Uber's business, its exploitation by criminals posing as Uber drivers to gain riders' trust was highly foreseeable. In fact, these occurrences were known to Uber to be regularly occurring. In addition, the burden to Uber of telling its riders the truth would be minimal.

### F.   Proximate Cause and Superseding Intervening Cause

Uber's proximate cause argument is misguided. The California Supreme Court cites with approval the Restatement of Torts section 449: "If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

24
MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC

1   such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the

2   actor from being liable for harm caused thereby." Restatement of Torts § 449 (1965); *McEvoy v.*

3   *American Pool Corp.*, 32 Cal.2d 295, 298-299 (1948); *Benton v. Sloss*, 38 Cal.2d 399, 405 (1952);

4   *Richardson v. Ham,* 44 Cal.2d 772, 777 (1955). Here, the risk that materialized and affected

5   Plaintiff Jane Doe was the very risk that Uber should have anticipated, and which it was negligent

6   for not addressing.

7         **G.**    **Punitive Damages**

8         Under California Civil Code 3294(a), Jane Doe is entitled to punitive damages if she

9   shows by clear and convincing evidence that Uber was guilty of oppression, fraud, or malice.

10   Malice, for purposes of this section, is "conduct which is intended by the defendant to cause injury

11   to the plaintiff or despicable conduct which is carried on by the defendant with a willful and

12   conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c).

13         There is evidence that Uber engaged in intentional concealment as well as despicable

14   conduct through its refusal to even acknowledge, study, or gather data regarding the risks of grave

15   harm to its riders at the hands of third-party criminals. "Conscious disregard for the safety of

16   another may be found 'where the defendant is aware of the probable dangerous consequences of

17   his or her conduct and he or she willfully fails to avoid such consequences.'" *Johnson & Johnson*

18   *Talcum Powder Cases*, 37 Cal. App. 5th 292, 332 (2019), review denied (Oct. 23, 2019). Uber is

19   not entitled to summary judgment on Plaintiffs' punitive damages claim.

20   **IV.**    **CONCLUSION**

21         For these reasons, Defendant Uber's motion for summary judgment or summary

22   adjudication should be denied.

23   Dated:  July 21, 2022               WALKUP, MELODIA, KELLY & SCHOENBERGER

24                       By:       /s/ Sara M. Peters

25                           MATTHEW D. DAVIS

26                           SARA M. PETERS

                              ANDREW P. McDEVITT

27                           KELSEY CONSTANTIN

                              Attorneys for PLAINTIFF JANE DOE

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

25

MPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MSJ - CASE NO. 3:19-cv-03310-JSC